UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
v.                              )       No. 3:23-CR-128-TAV-JEM
                                )
ALEXANDER GLENN ROSS,           )
                                )
            Defendant.          )

## REPORT AND RECOMMENDATION

This case is before the undersigned for report and recommendation on the United States's Motion to Amend the Order of Forfeiture for Money Judgment to Include Specific Substitute Assets [Doc. 126] initially referred to the undersigned on January 21, 2025 [Doc. 135] and again referred on March 31, 2025 [Doc. 146]. *See* 28 U.S.C. § 636(b).

On October 21, 2024, Defendant Alexander Ross entered a plea of guilty to a single count of wire fraud and "agree[d] to a personal money judgment against [him] and in favor of the United States which represents the proceeds [that he] personally obtained as a result of an offense in violation of 18 U.S.C. § 1343" [Doc. 118]. On November 26, 2024, United States District Judge Thomas A. Varlan entered an Order of Forfeiture for Money Judgment finding the Government is entitled to a personal money judgment of $100,000 [Doc. 122 p. 2]. The Government subsequently moved to amend the Order of Forfeiture to include Defendant's residence in Saint Cloud, Florida, as substitute property to satisfy the personal money judgement [Doc. 126 pp. 1–2][1] and to increase the amount of the money judgment to $396,440 [Doc. 155 p. 2]. Defendant objects to the amount

---

[1] The Government also moved to add as a substitute asset a 1979 Bellanca Citabria 7ECA aircraft (N5056T), seized on July 22, 2024, at the DeLand Municipal Airport. At the August 25, 2025 evidentiary hearing, the parties agreed this aircraft is already subject to forfeiture.

of the personal money judgment and the designation of his residence as a substitute asset [Doc. 127 pp. 2–3]. He argues that the amount of the money judgement is limited to the purchase price of the sole aircraft named in the Indictment, which is $21,000.

For the reasons discussed below, the undersigned finds the Government has proven by a preponderance of the evidence that the amount forfeitable as a personal money judgement is $396,440; that Defendant does not have other available assets in this amount; and that the Defendant's Florida residence is an appropriate substitute asset.

## I.     BACKGROUND AND EVIDENCE

On December 20, 2023, the Grand Jury returned an Indictment charging Defendant Ross and Codefendant James T. Markey with conspiring to falsify material facts concerning aircraft parts from at least April 15, 2022, through at least February 27, 2023 (Count One) [Doc. 3 ¶ 10]. The Indictment alleges overt acts relating to Defendant Ross's sale of aircraft N6522Q to R.P. following false logbook entries by Codefendant Markey [*Id*. ¶¶ 14–21]. The Indictment also charges Defendant Ross with fraud involving aircraft parts from April 15, 2022, through at least June 21, 2022 (Count Two), wire fraud on May 6, 2022 (Count Three), and money laundering on June 21, 2022 (Count Four) [*Id*. ¶¶ 22–26]. The Indictment contains forfeiture allegations, including that Defendant Ross shall forfeit any property constituting or derived from proceeds that he obtained directly or indirectly from the wire fraud [*Id*. ¶ 28].

The only aircraft expressly mentioned in the Indictment is N6522Q [*Id*. ¶¶ 14–22 & 24]. On March 21, 2024, the Government filed a Bill of Particulars for Forfeiture of Property notifying Defendant that it is seeking forfeiture of three additional aircraft: N8787D, N6210H, and N68515 [Doc. 27 p. 1]. Both Defendants gave statements to law enforcement—Codefendant Markey on

June 7, 2023 [Doc. 62-1], and Defendant Ross at the time of his arrest on January 18, 2024 [Doc. 61-1]—each implicating the other in the alleged offenses.

On October 21, 2024, Defendant Ross entered a guilty plea to a single count of wire fraud (Count 3) [Doc. 120, Minutes; *see also* Doc. 118, Plea Agreement]. Defendant stipulated to facts relating to the sale of aircraft N6522Q but expressly agreed that the facts submitted for purposes of his guilty plea "do not necessarily constitute all the facts in the case[ and o]ther facts may be relevant to sentencing" [*Id*. ¶ 4]. As part of his plea agreement, Defendant agreed to forfeit to the Government "immediately and voluntarily any and all assets and property, or portions thereof, which are in the possession or control of the defendant or defendant's nominees that constitute or are traceable to the proceeds of violations of [wire fraud, ]18 U.S.C. § 1343" [*Id*. ¶ 9]. The plea agreement states as a part of the forfeiture required, "Defendant agrees to a personal money judgment against the defendant and in favor of the United States which represents the proceeds the defendant personally obtained as a result of an offense in violation of 18 U.S.C. § 1343" [*Id*.]. The parties did not agree to a specific amount for the money judgment in the plea agreement [*Id*.].

On November 26, 2024, District Judge Varlan entered an Order on Forfeiture for Money Judgment providing that in his Plea Agreement, "Defendant agreed to a personal money judgment, representing the proceeds the Defendant personally obtained as a result of the offense in violation of 18 U.S.C. § 1343" [Doc. 122 p. 1]. It further states the amount of the money judgment is $100,000, which "represent[s] the proceeds the Defendant personally obtained as a result of the Defendant's violations of 18 U.S.C. § 1343" [*Id*. at 2].

On December 5, 2024, the Government moved to amend the Order of Forfeiture to include Defendant's residence in Saint Cloud, Florida, as a substitute asset [Doc. 126 pp. 1–2].[2] Defendant objected to the "calculation of the $100,000 money judgment" arguing the forfeiture amount is limited to his "actual financial gain" [Doc. 127 pp. 1–2]. He also questioned whether the Government demonstrated that he lacks sufficient proceeds to cover the money judgment without reaching substitute assets or that the listed substitute assets are appropriate [*Id*. at 3–4]. Defendant requested an "evidentiary hearing to allow [him] to challenge the government's calculation and its justification for including substitute assets" [*Id*. at 7].

The Government responded that a wire fraud conviction subjects Defendant to forfeiture of the proceeds of the entire scheme to defraud, not just the aircraft named in the Indictment [Doc. 130 p. 6 (citing *United States v. Venturella*, 585 F.3d 1013, 1015–17 (7th Cir. 2009)); *see also* Doc. 136 p. 3]. It asserted that the $100,000 money judgment is approximately one-tenth of Defendant's gain in "nearly a million-dollar fraud scheme" [Doc. 130 p. 7] and it requested the opportunity to argue for a greater amount at the evidentiary hearing [*Id*. at 9; Doc. 136 pp. 2–3].

District Judge Varlan referred the Government's motion for substitute assets and Defendant's accompanying objection to the amount of the money judgment to the undersigned [Doc. 135].

A.    **March 7, 2025 Evidentiary Hearing**

On March 7, 2025, the undersigned held an evidentiary hearing to determine the amount of the money judgment, whether Defendant has sufficient assets to fulfill the money judgment

---

[2]    As noted above, the Government also moved for the Court to include a "1979 Bellanca Citabria 7ECA[ aircraft] (N5056T), seized on July 22, 2024, at the DeLand Municipal Airport" as a substitute asset [Doc. 126 p. 2]. At the evidentiary hearing on August 25, 2025, the parties agreed this aircraft is already subject to civil forfeiture. Thus, the undersigned does not include it in the analysis.

4

without resort to the proposed substitute assets, and whether the Defendant's residence is an appropriate substitute asset. Assistant United States Attorneys Daniel P. Nugent, Anne-Marie Svolto, and Suzanne H. Sullivan appeared on behalf of the Government. Attorney Troy L. Bowlin, II, represented Defendant Ross, who was also present.

The Government presented the testimony of Special Agent Matthew DeVane of the Department of Transportation, Office of Inspector General. Agent DeVane testified regarding his investigation of twelve aircraft Defendant sold with false information regarding the annual inspections necessary to maintain flight status. Agent DeVane stated that to maintain flight status, an airplane must have a yearly inspection by an "airframe and powerplant mechanic," an "A&P," who has inspection authorization, "IA." He stated an A&P's IA cannot be delegated to a "lesser mechanic." Agent DeVane said once the A&P performs the annual inspection, he certifies the work he performed in the airplane's logbook.

Agent DeVane testified that Defendant engaged in a scheme with Codefendant James Markey, who is an A&P. According to Agent DeVane, Defendant would buy aircraft with maintenance issues, perform minimal maintenance on the aircraft, and then sell the aircraft to a buyer he found online. He stated that as a part of this scheme, Markey would certify that he completed an annual inspection on the aircraft but would either perform no maintenance on the aircraft or would not do the maintenance that he stated he did. Agent DeVane said Defendant would represent to a potential buyer that the annual inspection on the aircraft was up to date, a fact that increased the value of the aircraft. He said Defendant would sell the aircraft to the buyer and receive a check from the buyer by wire transfer. Agent DeVane testified that Defendant engaged in this scheme for additional aircraft beyond the one specified in the Indictment.

5

With the use of a summary chart [Exh. 4], Agent DeVane testified about the proceeds Defendant received for the twelve aircraft and the corresponding wire transfers of those proceeds along with any amount returned to the purchaser. He also testified regarding evidence from Defendant's bank accounts [Exhs. 2 & 3]. Agent DeVane testified that Defendant's gain from the sale of these aircraft was $564,640, and subtracting out amounts refunded to buyers ($103,200) and $65,000 for which he lacked the corresponding documentation, Defendant's total gain was $396,440. He also testified that during his investigation, he had not located significant assets for Defendant other than two substitute assets: Defendant's home in St. Cloud, Florida, and aircraft N5056T, which belonged to Defendant's business Gator Flights.

On cross-examination, Agent DeVane testified that he gathered information on which aircraft to include in his chart from an unrecorded interview of Codefendant Markey. He said he made notes during his interview of Markey and of the buyers and mechanics and then submitted summaries ("Memoranda of Activity" or "MOAs") to the Government. Agent DeVane said mechanics who conduct annual inspections of aircraft maintain their own records of inspections, and Markey provided copies of his documentation of logbook entries for the aircraft he identified as not properly inspected. Agent DeVane stated that information regarding aircraft numbers 8 and 12 on his chart were not provided by Markey.

When asked how Defendant knew that Markey did not perform a valid annual inspection on the airplanes listed in the chart, Agent DeVane testified that Defendant entered a guilty plea to wire fraud admitting he knew Markey did not perform a valid annual inspection on the airplane sold to Richard Price, who is victim 3 on the chart. He stated the transaction with victim 1 and the transaction with Mr. Price were about three weeks apart. He said all the transactions on the chart are "generally contemporaneous." Agent DeVane stated that Markey identified the planes on the

6

list (except for entries 8 and 12) as ones in which he performed an invalid annual inspection because he certified work that Defendant performed or work that was not done. Agent DeVane said Defendant paid Markey $1,000 per local annual inspection and $1,200 when Markey had to travel for the annual inspection.

Agent DeVane identified two aircraft from Markey's list where Defendant was present when Markey performed the incorrect annual inspection: N2374H, which is the airplane Defendant sold to Steve Blackwell, and N6522Q, which is the airplane Defendant sold to Richard Price. Agent DeVane said regarding the aircraft Defendant sold to Steve Blackwell (Victim 2), Markey said Defendant removed an engine from aircraft CF-DIG and had Markey install it in N2473H, then Markey entered incorrect information from Defendant into the logbook for N2473H. Agent DeVane said Defendant had knowledge of this incorrect logbook entry because Defendant told Markey what to write.

Agent DeVane testified that similarly, for aircraft N6522Q, the aircraft sold to Richard Price, Markey said he came to the airport in Virginia to perform the annual inspection and inspected an emergency locator transmitter (an "ELT") lying on a table, but did not reinstall it. Agent DeVane testified that Markey told him that he certified that he reinstalled the emergency locator transmitter, but he did not, and that Defendant was physically present during that inspection.

Agent DeVane testified that victim number 8, David Caicedo, who himself is an A&P, told him that Markey performed the annual inspection on the airplane he purchased from Defendant, but this airplane is not one that Markey included on his list. According to Agent DeVane, Mr. Caicedo opined that the annual inspection was "pencil whipped" because if the aircraft had received a proper annual inspection, it would have not had the issues he had with it. Agent DeVane

said that whether Markey performed an incorrect annual on Mr. Caicedo's airplane is marked "unknown" on his chart because this aircraft was not included on the list provided by Markey. Agent DeVann said Markey told him that he lost some of his data on inspections when he changed computers.

Agent DeVane stated that Markey also did not include the transaction in line 12 of his chart relating to the sale of an aircraft to Daniel Roche on his list of invalid annual inspections. Agent DeVane said instead, Defendant signed Markey's name as having done this annual inspection, and Markey was upset about it.

Following a brief recess during cross-examination, the parties asked the Court to adjourn the hearing and hold the forfeiture issues in abeyance to permit time for them to meet and confer on an agreement that the Court would impose restitution in lieu of forfeiture [*See* Doc. 141 p. 1]. The parties agreed to file a joint status report on the details of their agreement [*Id*.]. The undersigned granted the adjournment and permitted the parties to meet and confer on an agreement regarding forfeiture, instructed Agent DeVane that his testimony could be reopened, and ordered a status report in one week [*Id*. at 1–2].

### B.     Post-hearing Developments

On March 18, 2025, and instead of a status report, the parties presented the District Judge with an agreed order to restrain Defendant from dissipating assets [*See* Doc. 144]. In their joint motion for entry of the agreed order, the parties stated that during the recess in the evidentiary hearing, they "met and reached an agreement to hold the remainder of the forfeiture hearing in abeyance pending a determination of Defendant's objections to calculations in the PSR" [*Id*. at 3]. District Judge Varlan entered the Agreed Order preventing Defendant from dissipating or encumbering assets, specifically his residence in Saint Cloud, Florida, without the prior approval

of the Court [Doc. 145 p. 4]. On the same day, Judge Varlan entered a renewed referral Order for the Government's Motion to Amend the Order of Forfeiture for Money Judgment to Include Specific Assets [Doc. 146].

Following the second referral, the undersigned sought briefing on Defendant's response to the Government's position that the amount of the money judgment is the proceeds from the entire scheme to defraud and his position on the appropriate method of calculating the money judgment [Doc. 147 p. 3]. Defendant filed a supplemental brief arguing that he did not have the source material that Markey provided to Agent DeVane and upon which Agent DeVane relied to construct his summary chart and objected to a requirement that he "articulate itemized objections to transactions that are not in the record and have not been disclosed" [Doc. 148 pp. 1–2]. Defendant asserted that any forfeiture must be limited to proceeds he personally obtained [*Id*. at 4, 6]. Specifically, he maintained "the fact that [he] may have engaged in commercial transactions during the timeframe of the offense does not make those proceeds forfeitable unless the [G]overnment proves . . . [t]hat the transaction was part of the charged fraudulent scheme; and . . . [t]hat [Defendant] personally retained the proceeds of that transaction" [*Id*. at 5].

The Government responded that it provided Agent DeVane's summary chart and the banking records to defense counsel prior to the March 7 hearing, and that Agent DeVane's testimony establishes the amount of Defendant's gain from the entire scheme to defraud is $396,440 [Doc. 150 pp. 4–5, 8–10].

On June 5, 2025, Defendant moved to exclude evidence or compel disclosure of "all documentation, notes, memoranda, summaries, digital media, and communications related to" Agent DeVane's October 2024 interview of Codefendant Markey ("second Markey interview") [Doc. 152 pp. 1, 3]. The undersigned denied this request concluding the discovery procedures in

9

Federal Rule of Criminal Procedure 16 do not apply at this stage in the proceedings, the Court has no information that the information or documents provided by Codefendant Markey were exculpatory, and Defendant may challenge Agent DeVane's testimony on cross-examination [Doc. 160 pp. 10–12].

On June 16, 2025, District Judge Varlan entered a Preliminary Order of Forfeiture for four aircraft previously seized by the Department of Homeland Security including a 1979 Bellanca Citabria 7ECA (N5056T), seized on July 22, 2024, at the DeLand Municipal Airport, in DeLand, Florida [Doc. 161 pp. 2–3].[3]

### C. June 17, 2025 Evidentiary Hearing

The parties appeared on June 17, 2025, for a continuation of the evidentiary hearing. Assistant United States Attorneys Daniel Nugent and Suzanne Sullivan appeared on behalf of the Government. Attorney Troy L. Bowlin, II, again represented Defendant Ross, who was also present [Doc. 162].

Defense counsel resumed his cross-examination of Agent DeVane, who stated that the second column of his chart [Exh. 4] indicates whether Codefendant Markey told him that Markey "falsely certified" a logbook entry on an aircraft on which Defendant Ross performed some maintenance "work that was not properly supervised" [Doc. 179, Transcript, pp. 7–8]. Agent DeVane stated that two aircraft are marked "UNK" for "unknown" in this second column

---

[3] Three of these four aircraft are the subject of the Bill of Particulars filed on March 21, 2024 [Doc. 27]. The fourth (N5056T) was discussed at Defendant's September 25, 2024 revocation hearing [Docs. 88 & 94 p. 4]. In his plea agreement, Defendant agrees to assist with and not oppose the forfeiture of the aircraft seized by the Department of Homeland Security Investigations [Doc. 118 ¶ 9]. Again, at the August 25, 2025 evidentiary hearing, Defendant, through counsel, admitted that he has agreed to forfeit N5056T, and the Government stated that this aircraft is not part of the judicial forfeiture.

[*Id*. at 8]. He agreed that the second column reflects the aircraft that Markey said he performed an incorrect annual inspection for Defendant [*Id*.]. Agent DeVane said within two weeks of his second interview of Markey, defense counsel for Markey emailed documentation for the incorrect annual inspections for all the listed aircraft except for the two aircraft marked "unknown" in the second column [*Id*. at 9–10]. Agent DeVane said that the logbooks in which the annual inspections are recorded stay with the aircraft, but mechanics keep records to document their work [*Id*. at 15]. He said the information emailed from Markey's attorney was copies of Markey's records on the annual inspections on these aircraft [*Id*.].

According to Agent DeVane he interviewed ten of the purchasers of the aircraft by telephone; for one aircraft, he interviewed the next owner (not the purchaser from Defendant) both by telephone and in person; and for one aircraft, he did not interview the purchaser because the aircraft crashed in route and was not delivered to the purchaser [*Id*. at 11–12]. Agent DeVane denied that his second interview with Markey was the sole means by which he identified the victims on his chart [*Id*. at 13].

Agent DeVane testified that the date of the annual inspection found in column 5 of his chart came from the documents emailed from Markey except for number 12 [*Id*. at 14]. Regarding victim 12, Agent DeVane said that Defendant signed Markey's name to an annual inspection on February 12, 2023, but Markey did not complete the annual inspection [*Id*.]. He said Markey told him during the first interview that he did not sign this annual inspection [*Id*.]. Regarding victim 8, Agent DeVane testified that the annual inspection bore Markey's name but was not one of the annual inspections that Markey identified in his second interview [*Id*. at 22].

Agent DeVane stated that when he interviewed Mr. Astatkie (victim 1), he reported that the airplane he purchased from Defendant had an issue with the engine, and Mr. Astatkie was

going to have to pay to have the engine repaired [*Id*. at 22–23]. Agent DeVane said Mr. Astatkie reported that after he paid Defendant for the airplane, Defendant stopped communicating with him [*Id*.]. Agent DeVane thought Mr. Astatkie still owned the aircraft at the time of the interview [*Id*. at 23]. He said Mr. Astatkie reported paying $60,000 for the aircraft, but Agent DeVane could not find the $5,000 down payment in Defendant's bank records, so he listed $55,000 as the amount for that aircraft on his chart [*Id*. at 24].

Agent DeVane testified that the information from Markey was only part of how he determined the twelve individuals were victims [*Id*. at 28]. He said that after identifying the victim listed in the Indictment, agents subpoenaed Defendant's bank records, found people who paid Defendant in a similar way, and contacted them [*Id*. at 29]. Agent DeVane said the purchase amounts on his chart come from wire transfer records and the purchase amounts are supported by sales documentation by "OBI, which is . . . information that the originator provides" and by the information from Markey [*Id*.]. He said at the time the parties were engaged in plea negotiations, law enforcement had identified seven victims [*Id*. at 30]. Agent DeVane stated that he spoke with the following victims prior to receiving the documentation from Markey: Mr. Blackwell, Mr. Price, Mr. Roche, and Mr. Furlong [*Id*.]. He said he could not name the others with certainty without reviewing his records [*Id*.]. Agent DeVane agreed that Mr. Furlong's companies purchased two airplanes from Defendant [*Id*.]. He did not know why Mr. Furlong purchased a second airplane if he was dissatisfied with the first [*Id*.]. Agent DeVane said a common theme from his interviews with purchasers and in Defendant's jail phone calls with his wife is that Defendant's customers were unhappy [*Id*. at 31].

Agent DeVane agreed that for each of the listed aircraft, except for victim 12, Defendant knew at the time he sold the aircraft that Markey had performed an incorrect annual inspection on

it [*Id*. at 32]. He said for victim 12, Defendant signed Markey's name on the annual inspection [*Id*.]. Agent DeVane said he did not have this signature analyzed, but Markey told him that Defendant left a voicemail stating he had signed Markey's name and that he was sorry. Agent DeVane did not have access to that voicemail, nor had he listened to it [*Id*.]. He said Markey contacted the Federal Aviation Administration ("FAA") about this incident [*Id*.]. Also, according to Agent DeVane, Defendant was the only person who stood to benefit from signing Markey's name to an annual inspection [*Id*. at 33]. He said when Mr. Roche (victim 12) threatened to contact the FAA and law enforcement, Defendant refunded him the purchase price plus additional funds [*Id*.].

Agent DeVane stated that when an individual performs maintenance on an aircraft, they must document the maintenance and include their certificate number in the aircraft's logbook, which remains with the aircraft [*Id*.]. He said that Defendant told him that when Markey performed a "remote inspection[,]" Markey would create the log book entry from his handwritten notes once he returned to New York and email it to Defendant [*Id*. at 34]. Agent DeVane said he has seen photographs of the logbook entries for Mr. Blackwell (victim 2), Mr. Price (victim 3), Mustang Sally Aviation (victim 7); and Mr. Roche (victim 12) [*Id*.]. He testified that Markey did not recall seeing the aircraft or performing the annual inspection for victim 12, which is the one where Defendant signed his name [*Id*. at 35].

Agent DeVane stated that he notified each of the victims on his chart about the incorrect annual inspections, except for Mr. Deiman (victim 5), whose aircraft crashed before delivery [*Id*. at 36]. He agreed that a pilot who is also an owner and operator can perform preventative maintenance on his airplane [*Id*. at 37]. Agent DeVane stated that here, Defendant lost his pilot certification in 2018 when it was revoked in Canada, and Defendant's American pilot's license is

13

dependent on his Canadian license [*Id*.]. He stated that Markey is an expert in FAA regulations, and so Markey would know whether something Defendant did without supervision was preventative maintenance, rather than maintenance that required Markey's supervision [*Id*.]. Agent DeVane said he thought that a pilot who is also an owner of an aircraft could perform certain preventative maintenance, but the aircraft must still have an annual inspection by an A&P [*Id*.].

Agent DeVane testified that Defendant filed a complaint with the FAA against Markey after refunding Mr. Roche more than the purchase price due to Markey's complaint to the FFA about Defendant [*Id*. at 39]. Agent DeVane thought Defendant made a complaint to the FAA about Markey the day after Mr. Roche returned the aircraft to Defendant and a second complaint the next day, both in early March 2023 [*Id*.]. He characterized Defendant's complaints to the FAA as being in retaliation for Markey's complaint [*Id*.].

Agent DeVane stated that several of the victims had another annual inspection performed on their aircraft after he informed them that the annual inspection by Markey was invalid [*Id*. at 40]. He said that many of the victims had learned before he called them that the aircraft they purchased from Defendant was not airworthy [*Id*.]. He said many had also "noted mechanical issues upon receipt of the aircraft and an inability to get in in contact with [Defendant]" [*Id*.]. Agent DeVane said some of the victims had hired local mechanics to fix the problems with their airplanes before he called them [*Id*.].

After affirming that he was aware of his rights under the Fifth Amendment, Defendant testified that at the time Markey performed the annual inspections, he was not aware that Markey was doing incorrect annuals [*Id*. at 43]. Defendant stated with regard to aircraft N241NY on line one of the chart [Exh. 4], Defendant hired Markey and three of his technicians to perform repairs on N241NY [*Id*.]. Defendant said he paid $7,000 to ship parts to Markey's business, Take Flight

14

Aviation in New York, and to pay for Markey's labor [*Id.*]. Defendant testified that Mr. Astatkie purchased N241NY for his flight school, and before the purchase, Mr. Astatkie's mechanic Jason Shields performed a complete purchase inspection on the aircraft [*Id.* at 44]. Defendant explained that before a buyer purchases an aircraft, he will bring his mechanic of choice to conduct a prepurchase inspection, which is like an annual inspection but can be more detailed, giving the client an estimate of expected repairs over the next five years [*Id.* at 44–45]. Defendant said Mr. Shields inspected the aircraft and agreed it was a good aircraft but suggested new radios, a GPS system, and an updated interior [*Id.* at 45]. Defendant said he agreed to split the cost of those repairs and updates with Mr. Astatkie, and Mr. Shields made those repairs [*Id.*]. According to Defendant, Mr. Astatkie wired him $50,000 for the aircraft, and he wrote a check to Mr. Shields for $7,035.12 [*Id.* at 46]. Defendant agreed that Markey performed the annual inspection on N241NY, then Jason Shields performed the prepurchase inspection, and Mr. Astatkie bought the aircraft [*Id.*]. Defendant reported that less than a year later, Mr. Astatkie sold the aircraft for $97,000 after making another $15,000 in upgrades to the radio and a new paint job.

Regarding the second line of the chart and aircraft N2473H, Defendant testified he asked Markey to assemble two aircraft, each with "deficiencies,"—a Canadian registered aircraft CF-DIG and N2473H—and another engine into a single aircraft, which was delivered to Steve Blackwell [*Id.* at 46–47]. Defendant said Mr. Blackwell was not happy with his aircraft, so Defendant refunded him $22,000, and Mr. Blackwell kept a new GPS unit from the aircraft costing $1,740 "because of all the trouble he had been through" [*Id.* at 47].

Defendant stated that he entered a guilty plea to one count of wire fraud as to N6522Q, which is the aircraft sold to Richard Price [*Id.* at 47–48]. Defendant testified that he received this aircraft as a payment and hired three technicians to assemble it [*Id.* at 48–49]. He stated that

15

because none of the three were certified to conduct annual inspections, Markey came to Virginia to perform the annual inspection [*Id*. at 49–50]. Defendant agreed that when Markey performed the annual inspection in April, all the preventative maintenance had already been performed by the technicians and by him under their supervision [*Id*. at 50]. Defendant said Richard Price brought his own A&P, who inspected the aircraft and gave Defendant a "punch list" of items to repair [*Id*. at 51]. Defendant said the punch list was rectified, and Mr. Price took possession of the aircraft in June or July [*Id*.]. Defendant claimed that the 2016 oil filter on the aircraft was a "new old-stock oil filter" because new oil filters were hard to get during the COVID-19 pandemic [*Id*. at 52]. Defendant said he entered a guilty plea with regard to this aircraft because the ELT (emergency locator transmitter) was faulty and that part must be inspected by an A&P [*Id*. at 53]. Defendant said Markey inspected that part and "missed" it [*Id*.].

Defendant testified that he paid Markey $11,000 to do an annual inspection on an aircraft sold to Kevin Thacker (line 4 on the chart) [*Id*.]. Defendant said he was not aware of "any current deficiencies" in this aircraft and never heard from Mr. Thacker after making this sale [*Id*.]. Defendant noted that Agent DeVane did not interview Mr. Thacker [*Id*.].

Defendant stated that he flew Markey to Petersburg, Virginia, to perform an annual inspection on the aircraft he sold to James Deiman (line 5) [*Id*.]. He said this "aircraft was destroyed in the flats of New Mexico on a high-density altitude day [when it] essentially flipped over in the mud" [*Id*. at 54]. Defendant said he refunded Mr. Deiman within twenty-four hours of this incident [*Id*.].

Defendant testified that the individual who purchased aircraft N7018D (line 6) bought it just for the engine, which the purchaser used in another, more valuable airplane [*Id*. at 54]. Defendant said this explains why N7018D never flew again [*Id*.]. He said he first met Markey in

relation to this aircraft because Markey had conducted the annual inspection on the aircraft [*Id*. at 54].

Defendant testified that over a three-year period, Keith Furlong purchased seven aircraft from him, only two of which appear on the chart (lines 7 and 10) [*Id*. at 55]. Defendant said Mr. Furlong purchased the aircraft at line 7 from him, and Markey performed the annual inspection [*Id*.]. Defendant stated that after this aircraft was delivered, it sat outside for two months awaiting installation of a Garmin G5 system, and after this time, a bird's nest was found in the wing [*Id*.]. Defendant said Mr. Furlong bought the aircraft for $63,000, spent approximately $12,000 for upgrades, and had a second annual inspection performed to use the aircraft as collateral for a loan [*Id*. at 56–57]. Defendant denied knowing that the annual inspection performed by Defendant Markey was an incorrect annual and stated that an assessment that the aircraft had "wings full of dirt and the bird's nest, that doesn't negate an annual" inspection [*Id*. at 57].

Defendant stated that he paid Markey $1,500 for the annual inspection on Richard Price's aircraft because Markey "didn't have to do much work other than the physical inspection" [*Id*.]. Defendant said he paid Markey more than $30,000 for some of the annual inspections [*Id*. at 57–58]. Defendant stated that he had not seen the logbook entries for any of the aircraft on Agent DeVane's chart [*Id*. at 58]. He said when a mechanic deems an aircraft to not be airworthy, the mechanic must write in the logbook that the aircraft is not airworthy at this time and list the problems that must be rectified to bring the aircraft back to airworthy status [*Id*.].

Defendant testified regarding line 8 of the chart, that Markey performed this annual inspection but signed as Take Flight Aviation, rather than Jim Markey, because his business Take Flight Aviation needed money [*Id*.]. Defendant stated the purchaser David Caicedo continues to use that aircraft in his flight school [*Id*. at 59]. He said Mr. Caicedo had the aircraft for thirty days

17

before making the second payment, during which Mr. Caicedo "did a full inspection on it" [*Id*. at 59]. Defendant denied knowing why the chart states that "victim is IA/AP who said annual by Markey was bad" and said the Government has provided no information on this statement [*Id*.].

Defendant denied owning or selling the aircraft in line 9 on the chart but said he was with a friend when the friend delivered this airplane [*Id*. at 61]. He said no check was made out to him for this airplane [*Id*.].

Defendant said he purchased the aircraft in line 10 from the bank when a flight school went out of business [*Id*.]. He said he brought the aircraft to New York, where Take Flight performed the annual inspection and found no problems [*Id*.]. Defendant said he then sold the aircraft to Keith Furlong for $96,500 [*Id*. at 61–62]. He said at the time of this sale, he was not aware that any annual inspection by Markey was invalid [*Id*. at 62]. Defendant reiterated that Mr. Furlong purchased five more aircraft from him [*Id*.].

Defendant testified that he sold an aircraft (line 11) to Jared Cobia and his financier Johnny Slavens for $80,000, minus $8,000 to update the propellers so the aircraft could be used in their commercial flight school [*Id*. at 62–63]. He stated that Doug Keck, the mechanic for the purchasers, performed a prepurchase inspection over three days [*Id*. at 62]. Defendant stated that he was not aware of any problems with that aircraft, except that eight or nine months after the sale, the purchaser replaced a fuel bladder [*Id*. at 63]. Defendant said this repair was not foreseeable and likely due to the amount of flight time the aircraft averaged at the flight school [*Id*.].

Defendant testified with regard to the final aircraft on the chart (line 12) that one of Markey's A&Ps at Take Flight Aviation performed the annual inspection, signed Markey's name, and billed Defendant $16,000 but did not do $16,000 worth of repair work on the aircraft [*Id*.]. Defendant said, instead, when the purchaser performed the prepurchase inspection, that mechanic

18

flagged a long list of things that needed repair and which should have been repaired by Take Flight Aviation [*Id*.]. Defendant said he and Markey, then, "got in a spat" [*Id*.]. He said that he and another of Markey's customers filed complaints with the FAA on Markey [*Id*.]. Defendant said that he told the FAA that Markey should not be working on airplanes, "and that [comment] was after him having worked on 12 aircraft for me in that span" [*Id*. at 63–64].

Defendant stated that during the time of his interactions with Markey, he was working to become an airframe and powerplant technician [*Id*. at 64]. He said he apprenticed under six mechanics in addition to Markey to learn by working under their supervision [*Id*. at 64–65]. Defendant said in December 2023, he had a four-hour interview with the Orlando Flight District Safety Office, after which Defendant was deemed qualified to test for the A&P technician certification [*Id*. at 64].

Defendant testified that Markey commonly had his A&P technicians perform 90% of the work, after which Markey did the inspection [*Id*. at 65]. Defendant stated this was "completely legal" under the FAA regulations because the A&P technicians are certified. Defendant opined that the "paperwork" could be handled "a couple of different ways" [*Id*.]. He said that when he was running his flight school in Orlando, Defendant required the A&P technicians to make entries on the maintenance they performed [*Id*.]. Defendant said he then had the annual inspector "do the inspection entry after [them] for continuity purposes so that everybody knew what" work for which each person bore responsibility [*Id*.]. Finally, Defendant stated Agent DeVane's chart was worthless without the logbook entries to support it [*Id*.].

On cross-examination, Defendant immediately announced he would be asking counsel to file a motion to withdraw his guilty plea that day [*Id*. at 66]. The Court adjourned the evidentiary hearing to allow Defendant to litigate a motion to withdraw his guilty plea [*Id*. at 71], which

Defendant filed on June 20, 2025 [Doc. 165]. District Judge Varlan denied Defendant's motion to withdraw his guilty plea [Doc. 174].

### D.     August 25, 2025 Evidentiary Hearing

The parties again appeared for the continuation of the evidentiary hearing on August 25, 2025. Assistant United States Attorneys Nugent and Sullivan again appeared for the Government. Mr. Bowlin again represented Defendant, who was also present. The Government cross-examined Defendant, who read portions of his Plea Agreement [Exh. 5] and identified a Financial Statement [Exh. 6] that he signed on June 17, 2025. Defendant agreed that he listed no assets in response to the question asking him to list assets other than real estate and vehicles, including cash, jewelry, business accounts, vintage cars, airplanes, and monies owed to him by others.[4] The Court heard oral argument and took the matter under advisement. The matter is now ripe for adjudication.

---

[4]     Defendant asserted his Fifth Amendment right to not incriminate himself and declined to answer questions regarding his assets, his Marital Dissolution Settlement, or jail calls with his former wife. The Government objected to Defendant's assertion of a right to remain silent, arguing that although Defendant did not testify regarding these matters on direct examination, they are relevant to his truthfulness and credibility. The Court permitted Defendant to assert his Fifth Amendment right regarding matters that were not a part of his testimony on direct examination.

As a general rule, "[t]he subject matter of direct examination and issues of witness credibility are always open to cross-examination." *United States v. Moore*, 917 F. 2d 215, 222 (6th Cir. 1990) (citing *United States v. Arnott*, 704 F.2d 322, 324 (6th Cir. 1983)); *see also* Fed. R. Evid 611(b). Here, the Government argued that the matters on which it sought to question Defendant related to his credibility. The "right to discredit a . . . witness on cross-examination[, however,] cannot overcome the witness' privilege against self-incrimination, if properly asserted." *United States v. Gullet*, 713 F.2d 1203, 1208 (6th Cir. 1983) (citations omitted). "The privilege is properly invoked if the trial court determines that, in light of all the circumstances, the answer to a particular question would subject the witness to a real danger of further incrimination." *Id*. (citation omitted).

A defendant may assert the Fifth Amendment right in relation to forfeiture. *United States v. U.S. Currency*, 626 F.2d 11, 13 (6th Cir. 1980). In a case in which the Government's right to forfeiture and the defendant's Fifth Amendment right are in conflict, the court shall seek a solution that "'both protects the privilege and permits the forfeiture case to go forward.'" *Id*. at 16 (quoting *Thomas v. United States*, 531 F.2d 746, 750 (5th Cir. 1976)). One such solution is to permit

20

## II.    FINDINGS OF FACT

Based upon the evidence presented at the evidentiary hearings on March 7, June 17, and August 25, 2025, and the entire record, the undersigned finds the Government has proven the following by a preponderance of the evidence.

On May 25, 2022, B. Astatkie wired $50,000 to Defendant for the purchase of aircraft N241NY. Mr. Astatkie reported also paying a $5,000 downpayment, but no record exists that Defendant deposited the downpayment in his bank account. Prior to the sale, Codefendant James Markey performed an invalid annual inspection of N241NY on May 21, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On June 23, 2022, Steve Blackwell wired $23,740 for the purchase of aircraft N2473H. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N2473H on June 13, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform. Defendant refunded Mr. Blackwell $22,000 from the sale.

On June 22, 2022, Richard Price wired Defendant $21,000 for the purchase of aircraft N6522Q. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N6522Q on April 23, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

---

assertion of the privilege on cross-examination but to strike any of a defendant's direct testimony that relates to the "elements or specific events of the offense." *Gullet*, 713 F.3d at 1208–09. This prevents a defendant from using his Fifth Amendment privilege as a sword, rather than a shield. *U.S. Currency*, 626 F.2d at 16 (citations omitted). Cross-examination going to credibility, however, does not require that the direct testimony be stricken. *Gullet*, 713 F.3d at 1209.

Here, the Government did not question Defendant about the substance of his testimony on direct examination but instead sought to question Defendant about matters not raised on direct examination to impeach his credibility. The Court permitted Defendant to invoke his Fifth Amendment privilege to these questions.

On July 6 and 21, 2022, Kevin Thacker of Compliance IT Solutions wired a total of $54,700 to Defendant for the purchase of aircraft N121M. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N121M on June 16, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On July 7, 2022, James Deiman wired $11,200 to Defendant for the purchase of aircraft N5824Z. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N5824Z on April 20, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform. N5824Z was destroyed during delivery, and Defendant refunded $11,200 to Mr. Deiman.

On July 25, 2022, Michael Hoeksel wired $11,000 to Defendant for the purchase of aircraft N7018D. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N7018D on April 1, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On August 4, 2022, Keith Furlong of Mustang Sally Aviation, LLC, provided a cashier's check for $63,000 to Defendant for the purchase of aircraft N65742. Defendant deposited the check the following day. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N65742 on August 4, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On August 17 and 26 and on September 16 and 23, 2022, David Caicedo of Sky Aviation Club, LLC, wired a total of $39,500 to Defendant for the purchase of aircraft N28FF. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N28FF on an unknown date in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On an unknown date, Michael "Mitch" Molitor of Marmitt Management, Inc., paid $60,000 by check to Defendant for the purchase of aircraft N8439U. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N8439U on April 1, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform. Agent DeVane was not able to locate the check for $60,000 in Defendant's bank records.

On November 14, 2022, Keith Furlong of Svetfur Aviation wired $96,500 to Defendant for the purchase of N717G. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N717G on November 2, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On December 22, 2022, Johnny Slavens and Jared Cobia wired $72,000 to Defendant for the purchase of aircraft N5852X. Prior to the sale, Codefendant Markey performed an invalid annual inspection of N5852X on November 1, 2022, in which Markey certified that maintenance was performed which was not performed or that he did not perform.

On February 13 and 14, 2023, Daniel Roche and Aero Space Reports, Inc., wired a total of $57,000 to Defendant for the purchase of aircraft N172HT. Prior to the sale, Defendant falsely represented that Codefendant Markey performed an annual inspection of N172HT on February 12, 2023, but Markey did not perform the inspection. When Markey filed a complaint with the FAA, Defendant refunded $70,000, an amount exceeding the purchase price, to Mr. Roche.

Defendant's sole reported assets are his residence, which he values at $405,000, and his vehicle, which he values at $27,000.

## III.    ANALYSIS

"The federal forfeiture laws allow the United States to seize property 'derived from or used to facilitate criminal activity.'" *United States v. Agrawal*, 97 F.4th 421, 442 (6th Cir. 2024)

23

(quoting *Honeycutt v. United States*, 581 U.S. 443, 447 (2017)). Defendant entered a guilty plea to a single count of wire fraud agreeing that he "devised and intended to devise a scheme for obtaining money by means of materially false and fraudulent pretenses, representations, and promises," and that he executed this scheme by transmitting wire communications in interstate commerce [Doc. 118 ¶ 1 (citing 18 U.S.C. § 1343)]. Additionally, Defendant agreed to forfeit all assets and property "that constitute or are traceable to the proceeds of violations of 18 U.S.C. § 1443," including "a personal money judgment against the defendant and in favor of the United States which represents the proceeds the defendant personally obtained as a result of an offense in violation of 18 U.S.C. § 1343" [*Id.* ¶ 9].

The referred motion and Defendant's response/objection raise two primary issues: (1) the appropriate amount of the money judgment and (2) whether Defendant's residence is an appropriate substitute asset. Defendant objects to the "calculation of the $100,000 money judgment" arguing the forfeiture amount is limited to his "actual financial gain" [Doc. 127 pp. 1–2]. The Government responds that the statutes governing forfeiture "mandate forfeiture of any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of a violation of [§ 1343]" [Doc. 130 pp. 1–2 (citing 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))]. It asserts that because Defendant is convicted of a scheme to defraud under the wire fraud statute, "he must forfeit the proceeds of the entire scheme" [*id.* at 6], which it alleges is $396,440 [Doc. 155 p. 2]. It contends this amount exceeds Defendant's known traceable assets, making the substitution of the Florida residence appropriate [Doc. 130 pp. 4–5; 7–9].

24

Defendant alleges the amount of the personal money judgment is $21,000, which represents his actual gain from the sale of the aircraft named in Count Three of the Indictment.[5] He contends that the value of his residence far exceeds this amount (or the $100,000 in the Order of Forfeiture) and that the Government fails to show that he does not have sufficient assets to cover the forfeiture without reaching to substitute assets [Doc. 127 p. 3].

After review of the entire record and the relevant law, the undersigned finds the money judgment properly includes proceeds from the entire scheme to defraud and Defendant's residence is an appropriate substitute asset.

## A.    Forfeiture Amount

Defendant Ross first contests the amount of forfeiture. He argues that the personal money judgment in this case is limited to $21,000, which is the amount of the sale of the aircraft N6522Q listed in the Indictment. He further argues that he did not enter a guilty plea to the conspiracy count and, therefore, should not forfeit the purchase price of other aircraft aside from N6522Q.[6] And he contends that the Government fails to prove the purchase price of the other eleven aircraft are "proceeds" of wire fraud.

---

[5]    During oral argument at the August 25, 2025 evidentiary hearing, defense counsel stated that the amount of forfeiture is limited to the proceeds from the sale of an airplane to Richard Price, which is line three on Agent DeVane's chart [Exh. 4]. The chart provides that Defendant sold an aircraft to Mr. Price for $21,000 [*Id.*].

[6]    At the August 25 evidentiary hearing, Defendant also reasserted his argument that he is entitled to the records provided by Codefendant Markey and Agent DeVane's MOAs of his interviews of the alleged victims and mechanics. The undersigned has already decided this issue [Doc. 160 p. 12]. Moreover, the undersigned finds that Defendant had time to investigate the twelve transactions on Agent DeVane's summary chart between the March 7 hearing at which he presented his chart and the June 17 hearing at which defense counsel cross-examined Agent DeVane.

25

The criminal and civil forfeiture statutes, read together, permit the government to seek forfeiture of the proceeds of wire fraud. *Agrawal*, 97 F.4th at 442 (citing 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c)); *see also United States v. Hampton*, 732 F.3d 687, 691 (6th Cir. 2013) (stating the criminal and civil forfeiture statutes permit forfeiture of the proceeds of wire fraud). Section 981(a)(1)(C) allows the government to seek forfeiture for "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the commission of certain specified offenses, including wire fraud. *Agrawal*, 97 F.4th at 442.

As the Government argues [Doc. 130 p. 6; Doc. 150 p. 9], the undersigned finds that the forfeiture in this case is not limited to the aircraft listed in the Indictment but extends to the proceeds from the entire scheme to defraud. *See United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009) ("The defendants pled guilty to one count of mail fraud that also alleged a fraudulent scheme, and the amount of the mailing, by itself, does not adequately account for the proceeds obtained from their crime of conviction."); *see also United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016) (holding the forfeitable proceeds from a single instance of wire fraud include the gain from the fraudulent scheme as a whole); *United States v. Capoccia*, 503 F.3d 103, 117–18 (2d Cir. 2007) ("Where the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise," the forfeitable proceeds include the proceeds of "that scheme, conspiracy, or enterprise.") "Because the proceeds from a mail fraud or wire fraud offense include funds obtained 'as the result of the commission of the offense,' and the commission of such a mail fraud or wire fraud offense necessarily includes a fraudulent scheme as a whole, the proceeds of the crime of conviction consist of the funds involved in that fraudulent scheme, including additional executions of the scheme that were not specifically charged or on which the defendant was acquitted." *Lo*, 839 F.3d at 793 (citation omitted).

In *Venturella*, a case relied upon by the Government, the defendants entered a guilty plea to a single count of mail fraud in the amount of $477.90, for falsely inducing the mailing of social security benefits in a scheme to defraud the Social Security Administration. 585 F.3d at 1016. The Seventh Circuit upheld forfeiture of $114,313, the proceeds of the entire scheme to defraud. *Id*. at 1017. The court relied upon the following definition of "proceeds" in making its determination: "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." *Venturella*, 585 F.3d at 1017 (quoting 18 U.S.C. § 981(a)(2)(A)). Thus, it found "[t]he plain language of . . . section 981(a)(1)(C) along with the expansive definition of 'proceeds' indicates that the statute contemplates the forfeiture of property other than the amounts alleged in" a single count of mail or wire fraud. *Id*.

In addition, the goods and services at issue here—aircraft and annual inspections—are not illegal by nature. Instead, Defendant engaged in a scheme to sell aircraft in an illegal manner, i.e., while knowing the annual inspection was invalid. "The meaning of 'proceeds' [in a particular case] turns on the nature of the goods and services at issue." *United States v. Shalash*, No. 05-56, 2007 WL 9761392, at *1 (E.D. Ky. Feb. 16, 2007), *aff'd*, 2008 WL 11503965 (6th Cir. June 20, 2008). The definition in § 981(a)(2)(A), which the court relied upon in *Venturella*, "expressly applies not only to illegal goods but also to cases involving 'unlawful activities.'" *Id.* at *2 (citing 18 U.S.C. § 981(a)(2)(A)). "Unlawful activities" for purposes of forfeiture are any acts involving or constituting an offense in 18 U.S.C. § 1961(1). *Id*. (citing 18 U.S.C. § 981(a)(1)(C) & 18 U.S.C. § 1956(c)(7)). Defendant Ross entered a guilty plea to a single count of wire fraud for engaging in a scheme to defraud by offering aircraft for sale with invalid annual inspections. Wire fraud is a listed offense in § 1961. Hence, here, the definition of "proceeds" set forth in § 981(a)(2)(A)

27

applies, and forfeiture is not limited to the net gain or profit realized from the offense. *Id.* (finding the same with respect to 18 U.S.C. §§ 2314 & 2315).

Defendant argues that the Government fails to prove that the sales receipts from the eleven other aircraft aside from N6522Q on Agent DeVane's chart are part of the scheme to defraud. The Court disagrees. Agent DeVane linked the eleven other aircraft to the scheme through his interview of Markey, copies of records documenting Markey's annual inspections provided by Markey, interviews with the victims and their mechanics, and bank records. Agent DeVane testified that Defendant was present during two of the invalid annual inspections by Markey. Finally, Agent DeVane testified that Defendant was the one who stood to benefit financially from the faulty annual inspections because a recent annual inspection added to the value of an airplane advertised for sale [Doc. 179 pp. 32–33].

Defendant's own testimony further supports this finding. Defendant indicated that Markey performed annual inspections on twelve aircraft, stating that he filed a complaint with the FAA about Markey, giving his opinion that Markey was not fit to be working on airplanes, and this was "after [Markey] having worked on 12 aircraft for me in that span" [Doc. 179 pp. 63–64]. Through his guilty plea, Defendant admitted that Markey performed an invalid annual inspection on N6522Q, which Defendant sold to Mr. Price [*Id*. at 50, 53]. Eight of the other aircraft had annual inspections by Markey after the inspection of N6522Q. The three inspections that predated N6522Q's inspection occurred within twenty days before N6522Q [*See* Exh. 4 (lines 5, 6, & 9)]. Additionally, Defendant testified that he was apprenticing to become an A&P technician and was familiar with the paperwork required for an annual inspection.

Accordingly, the undersigned finds that the purchase price of all twelve aircraft listed on Agent DeVane's chart constitutes proceeds of Defendant's wire fraud scheme. Agent DeVane

28

testified that the total purchase price for the twelve aircraft that are part of the scheme to defraud is $564,640 [*See* Exh. 4; Doc. 150 p. 6]. The Government subtracts from this total $103,200, which Defendant refunded to the purchasers, and $65,000,[7] which are funds paid by the purchasers but not located as deposits in Defendant's bank records [Exh. 4; Doc. 150 p. 6]. Thus, the undersigned finds the total proceeds from the scheme is $396,440 [*See id*.]. The undersigned **RECOMMENDS** this total as the amount of the personal money judgment.

**B.    Substitute Asset**

Defendant also objects to the designation of his residence as a substitute asset, arguing that the Government has not shown that he has insufficient traceable assets to satisfy the forfeiture.

Substitute assets are subject to forfeiture when, "as a result of any act or omission of the defendant," the property derived from or constituting the proceeds of an offense

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p)(1). In any of these circumstances, "the court shall order the forfeiture of any other property of the defendant, up to the value of [the traceable proceeds]." *Id.* § 853(p)(2).

---

[7]    The total proceeds are appropriately discounted by $65,000 because the Government does not seek this amount in forfeiture [Doc. 150 p. 6]. It notes that victims 1 and 9 provided "oral statements . . . regarding payments to defendant in the denominations of $60,000 and $5,000" [*Id*. at 6 n.1]. The Government has yet to locate these amounts in the subpoenaed records and elected to reduce the amount of the money judgment by these amounts "[i]nstead of resubmitting a supplemental subpoena" [*Id*.].

29

Here, the value of the proceeds of Defendant's scheme to defraud is $396,440. Agent DeVane testified at the March 7 hearing that Defendant no longer has the proceeds from his sales of aircraft in 2022 and early 2023, nor could Agent DeVane locate these proceeds with due diligence [*See also* Doc. 130-1, Declaration of Agent DeVane ¶ 8]. Defendant disputes these facts, but the financial information he submitted bears this out. Defendant claims to have no assets other than his residence and a truck valued at $27,000 [Doc. 163-1 pp. 13–15 (Defendant's Financial Statement); Exh. 6]. Defendant's Marital Settlement Agreement reveals that the residence is Defendant's premarital property in his name and subject to a loan in his name only [Doc. 163-1 p. 2 (Defendant's Marital Settlement Agreement)[8]]. The Marital Settlement Agreement, however, recognizes that the residence has "a marital component" and states that the residence is currently in foreclosure. *Id*.

Defendant also argues that the value of the residence, which he contends approaches $700,000, far exceeds the amount of the personal money judgment [Doc. 127 p. 4 (stating value of Def's residence is seven times more than the $100,000 money judgment)]. Not so. Defendant values the residence at $405,000 and states it is subject to a mortgage [Doc. 163-1 p. 13; Exh. 6; *see also* Doc. 130 p. 7 (Government states Defendant's residence recently appraised between $408,000–$480,000 and is encumbered by a mortgage and unpaid property taxes)]. Based upon the information in the record, the undersigned finds that Defendant's residence is an appropriate substitute asset.

---

[8] Defendant's Marital Settlement Agreement was not admitted as an exhibit at the August 25, 2025 hearing. This document appears in the record, however, as an attachment to the United States of America's Motion to Restrain Defendant, Along with Any Agents, Representatives, or Co-owners, from Dissipating or Encumbering Assets [Doc. 163-1 pp. 29–41]. The Court is permitted to consider "evidence already in the record" in determining the appropriate amount of forfeiture. Fed. Rule Crim. P. 32.2(b)(1)(B).

## IV. CONCLUSION

For the reasons discussed above, the undersigned finds as follows:

> (1) the amount of the personal money judgment is $396,440, which represents proceeds derived from Defendant's scheme to defraud;
>
> (2) the proceeds from the scheme to defraud are no longer available or cannot be located with due diligence; and
>
> (3) the Defendant's residence is a suitable substitute asset for forfeiture.

Accordingly, the undersigned recommends that the District Judge **GRANT** the Government's Motion to Amend the Order of Forfeiture for Money Judgment to Include Specific Substitute Assets [**Doc. 126**]; that the District Judge **DENY** Defendant's objection to the amount of the money judgment [**Doc. 127**]; and that the District Judge **GRANT** the Government's Motion for Entry of Amended Order of Forfeiture for Money Judgment [**Doc. 155**].[9]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide de novo review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

31