UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
v.                             )      No.:   3:23-CR-128-TAV-DCP-1
                               )
ALEXANDER GLENN ROSS,          )
                               )
            Defendant.         )

## MEMORANDUM OPINION AND ORDER

This criminal case is before the Court on defendant's objections [Doc. 199] to the Revised Presentence Investigation Report ("RPSR") [Doc. 195].  The government responded to these objections [Doc. 200].  The Court bifurcated the sentencing in this case to hear argument on the objections prior to imposing a sentence [Doc. 196].  On January 12, 2026, at the first phase ("Phase I") of the sentencing hearing, the Court heard argument as to defendant's RPSR objections [Doc. 205].  For the reasons below, defendant's objection to the acceptance of responsibility reduction under § 3E1.1(a) of the Sentencing Guidelines will be **SUSTAINED**, and his remaining objections will be **OVERRULED**.

## I.      Background

On December 20, 2023, a federal grand jury returned an indictment, charging defendant with (1) conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371 (Count One); (2) fraud involving aircraft parts, in violation of 18 U.S.C. § 38(a)(1)(A) and (b) (Count Two); (3) wire fraud, in violation of 18 U.S.C. § 1343 (Count Three); and (4) money laundering, in violation of 18 U.S.C. § 1957 (Count Four) [Doc. 3].

On October 21, 2024, defendant pleaded guilty to Count Three of the indictment, that is, wire fraud, in violation of 18 U.S.C. § 1343 [Doc. 120]. Pursuant to a Rule 11(c)(1)(A) provision in defendant's plea agreement, the government agreed to move at the time of sentencing to dismiss the remaining counts in the indictment [Doc. 118].

On January 7, 2025, the probation officer disclosed the original presentence investigation report ("original PSR") [Doc. 131]. Defendant filed objections [Doc. 134], and the government responded in its sentencing memorandum [Doc. 188]. The government also filed a notice of no objections [Doc. 133].

On June 20, 2025, defendant filed a motion to withdraw his guilty plea [Doc. 165], which the Court denied [Doc. 174]. The Court subsequently granted the government's motion for leave to file a notice of objections to the original PSR [Docs. 175, 177], and the government filed its objections on August 8, 2025 [Doc. 178]. Specifically, the government objected that the original PSR should be amended to include: (1) a 2-level enhancement for obstruction of justice based on defendant's motion to withdraw his guilty plea and attempt to avoid forfeiture and restitution; (2) sufficient information about defendant's post-plea conduct for the Court to determine if the 2-level acceptance of responsibility reduction is appropriate; and (3) information about defendant's conduct since the original PSR was prepared [*Id.*]. Defendant responded to the government's objections [Doc. 192]. The probation officer then disclosed an addendum [Doc. 194] and the RPSR [Doc. 195], which added a 2-level enhancement for obstruction of justice, removed the 2-level reduction for acceptance of responsibility, and added information

2

about defendant's conduct since the preparation of the original PSR, rendering the government's objections [Doc. 178] moot.

The Court subsequently entered an order bifurcating the sentencing hearing and ordering the parties to be prepared to address any objections to the RPSR at Phase I of the sentencing hearing [Doc. 196]. Thereafter, the government filed a notice of no objections to the RPSR [Doc. 198]. Defendant filed objections [Doc. 199], and the government responded [Doc. 200].[1] Defendant's objections to the RPSR reiterated the same objections that he previously filed to the initial PSR and added objections to the RPSR's addition of the obstruction of justice enhancement and removal of the acceptance of responsibility adjustment [*See* Docs. 134, 199]. A second PSR addendum was then released [Doc. 201]. On January 12, 2026, the Court conducted Phase I of the sentencing hearing and heard oral argument on defendant's objections [Doc. 205].

## II.    Legal Standard

Under Federal Rule of Criminal Procedure 32(f), after receiving the PSR, a party may submit any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report. Fed. R. Crim. P. 32(f)(1). The Court then must either rule on the disputed portions of the PSR or determine that a ruling is unnecessary either because the matter will not affect sentencing or because the Court will not consider the matter in sentencing. Fed. R. Crim. P.

---

[1] Therein, the government relies on its initial response to several of defendant's objections, noting that defendant restated his PSR objections nearly verbatim [Doc. 200].

3

32(i)(3)(B). The Sixth Circuit requires "literal compliance" with this rule, because the sentencing court's factual findings help "to ensure that defendants are sentenced on the basis of accurate information and provide a clear record for appellate courts, prison officials[,] and administrative agencies who may later be involved in the case." *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997) (internal quotation marks and alterations omitted). Once a defendant raises an objection, the Court must make a factual finding by a preponderance of the evidence. *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007).

## III. Analysis

### A. Factual Objections

#### 1. Hearsay

Throughout his objections, defendant repeatedly argues that facts within the RPSR are hearsay [*See* Doc. 199]. As a preliminary matter, the Court finds that the Federal Rules of Evidence, except for those on privilege, do not apply during sentencing proceedings. *See* Fed. R. Evid. 1101(d)(3); *see also United States v. Bates*, 315 F. App'x 591, 594 (6th Cir. 2009) ("Generally, hearsay evidence is admissible in sentencing proceedings, because the Federal Rules of Evidence do not apply.") (citations omitted); *United States v. Hamad*, 495 F.3d 241, 246 (6th Cir. 2007) ("The Rules of Evidence do not apply at sentencing[.]"); *United States v. Nguyen*, 19 F. App'x 282, 288 (6th Cir. 2001) ("[H]earsay evidence is admissible in sentencing proceedings."); *United States v. Davis*, 170 F.3d 617, 622 (6th Cir. 1999) ("Hearsay evidence is admissible in guideline sentencing hearings."). Accordingly, defendant's hearsay objections are **OVERRULED**.

4

## 2. Discovery

In addition, defendant argues that the government has not met its discovery obligations by failing to provide evidence of certain facts contained in the RPSR [*See* Doc. 199]. Defendant largely raises vague assertions that facts outside of Count Three of the indictment were discoverable prior to his guilty plea and were not provided to him [*Id.*]. At Phase I of the sentencing hearing, defendant stated that he has not received condensed memorandums, information provided to the United States Attorney's Office, log books, or service records.

Here, defendant has not cited any rule, statute, or case law that entitles him to the discovery of these sentencing materials. Nevertheless, Rule 16, which governs discovery in a criminal case, does not apply to the sentencing phase. *See* Fed. R. Crim. P. 16; *United States v. Gibbs*, 646 F. App'x 403, 413 (6th Cir. 2016) (quoting *United States v. Pirosko*, 787 F.3d 358, 367–68 (6th Cir. 2015) (internal quotation marks omitted)) ("[R]equests for discovery fall outside the scope of [Rule 16] if a defendant is 'not seeking the discovery to aid in the preparation of his defense,' but is 'attempting to obtain the discovery for the purpose of gathering materials to support various sentencing arguments'."); *see also United States v. Robinson*, 503 F.3d 522, 532 (6th Cir. 2007) (finding that the defendant's request for discovery fell outside of Rule 16 because "he was attempting to obtain the discovery for the purpose of gathering materials to support various sentencing arguments"); *United States v. Brinson*, 208 F. App'x 420, 423 (6th Cir. 2006) (noting that Rule 16 was intended to apply to issues impacting the defendant's culpability).

5

Given that defendant has not pointed to any authority or evidence supporting his argument that the government has not complied with its discovery obligations, defendant's objections in this regard are **OVERRULED.**

### 3. Issuance of an Arrest Warrant

Paragraphs 19 and 107 of the RPSR state that on August 5, 2024, the Circuit Court of Osceola County, Florida, issued an arrest warrant charging defendant with a Scheme to Defraud over $50,000 and Grand Theft Auto Over $100,000 [RPSR ¶¶ 19, 107]. The RPSR notes that these charges arise out of defendant's fraudulent sale of an aircraft that was "not airworthy and in a state of disrepair" to Jamie McBride [*Id.* ¶ 107].

Defendant objects to the facts in Paragraph 19 as unsupported by the evidence, and states that there is no outstanding process or arrest warrant in the record [Doc. 199, pp. 2, 4]. Defendant demands "strict proof" of the facts in Paragraph 19 prior to Phase II of the sentencing hearing [*Id.* at 2].

The government counters that the probation office petitioned the Court to issue an arrest warrant for defendant based, in part, on an arrest warrant in the Ninth Judicial Circuit Court of Osceola County, Florida [Doc. 188, p. 18]. It asserts that a redacted copy of defendant's arrest warrant was entered into evidence during his revocation hearing [*Id.*].

Federal Rule of Criminal Procedure 32(i)(3)(B) provides:

> At sentencing, the court: (A) may accept any undisputed portion of the presentence report as a finding of fact; [and] (B) must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing . . . .

6

Fed. R. Crim. P. 32(i)(3)(B). Therefore, the Court "may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings." *United States v. House*, 872 F.3d 748, 752 (6th Cir. 2017) (citing *United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994)); *see also United States v. McDonald*, 43 F.4th 1090, 1095 (10th Cir. 2022) (quoting *United States v. Harrison*, 743 F.3d 760, 763 (10th Cir. 2014)) ("[T]he district court may rely on facts stated in the presentence report unless the defendant has objected to them.").

If "certain facts are in dispute, mere reliance on the PSR i[s] insufficient." *United States v. Welti*, 446 F. App'x 784, 786 (6th Cir. 2012) (citing *United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003)). Instead, "the district court must *actually find facts* . . . by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted) (emphasis in original). However, "[t]he facts in a PSR must be '*sufficiently controverted* to trigger the sentencing court's fact-finding duty[.]'" *Id.* (emphasis added) (quoting *United States v. McGee*, 529 F.3d 691, 700 (6th Cir. 2008)).

"[T]o invoke the district court's Rule 32 fact-finding obligation, the defendant is required to make specific allegations of factual inaccuracy." *United States v. Chee*, 514 F.3d 1106, 1115 (10th Cir. 2008) (internal quotation marks and citation omitted); *see also United States v. Rivero*, No. 22-2195, 2023 WL 2784049, at *4 (8th Cir. Apr. 5, 2023) (noting that a defendant "must object to the facts contained in the PSR with specificity and clarity so as to put the [g]overnment on notice of the challenged facts" (internal quotation marks and citations omitted)). As a result, "[a] defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth" and rather, "beyond such a bare denial, he

7

must produce some evidence that calls the reliability or correctness of the alleged facts into question." *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (quoting *Mustread*, 42 F.3d at 1102). "[T]he defendant gets no free ride: *he must produce more than a bare denial*, or the judge may rely entirely on the PSR." *Id.* (quoting *Mustread*, 42 F.3d at 1102) (emphasis added).

Defendant's objections regarding Paragraphs 19 and 107 of the RPSR are a bare denial at best. Defendant has not made any "specific allegations of factual inaccuracy." *Chee*, 514 F.3d at 1115 (internal quotation marks and citation omitted). Nor has he presented any evidence that "calls the reliability or correctness of the alleged facts into question." *See Lang*, 333 F.3d at 681 (quoting *Mustread*, 42 F.3d at 1102). Thus, defendant has not invoked the Court's Rule 32 fact-finding obligation. *See Chee*, 514 F.3d at 1115.

Nevertheless, there is sufficient evidence in the record to support the facts in Paragraphs 19 and 107. First, the United States Probation Office ("USPO") petitioned the Court to issue an arrest warrant for defendant in its petition for action on conditions of pretrial release [Doc. 68]. In support, USPO relied upon an arrest warrant for defendant issued by the Ninth Judicial Circuit Court of Osceola County, Florida, based on charges of a Scheme to Defraud Over $50,000, and Grand Theft Auto Over $100,000 [*Id.* at 2]. The petition represents that defendant accepted large sums of money and falsified receipts for repair work that was not completed on the aircraft he sold [*Id.*]. On August 9, 2024, United States Magistrate Judge Jill E. McCook issued an arrest warrant for defendant based on the USPO's petition, a redacted copy of which was entered into evidence during defendant's

revocation hearing [*See* Doc. 89; Doc. 94, p. 2]. Thus, defendant's assertion that there is no evidence of an arrest warrant for defendant is inaccurate. Accordingly, defendant's objections to Paragraphs 19 and 107 of the RPSR are **OVERRULED**.

### 4. Defendant's Pre-Trial Release Conduct

Paragraphs 20 and 106 of the RPSR contain facts related to defendant's conduct while on pre-trial release [*See* RPSR ¶¶ 20, 106]. Specifically, Paragraph 20 notes that defendant "failed to obtain permission for planned travel outside of the Middle District of Florida" on or about August 5, 2024 [*Id.* ¶ 20]. It states that defendant gave his probation officer a copy of his flight itinerary for travel to Chicago, Illinois; however, defendant's GPS monitoring device showed that he flew to an airport in Michigan instead [*Id.*]. According to the RPSR, defendant was arrested when he landed in Michigan because he did not have permission to leave Chicago or travel on another aircraft at that time [*Id.*].

Further, Paragraph 106 of the RPSR states that on July 22, 2024, at the DeLand, Florida Municipal Airport, Homeland Security Investigations seized aircraft N5056T, which was believed to be owned by defendant, but was registered deceptively with the Federal Aviation Administration ("FAA") [*Id.* ¶ 106]. It notes that agents applied a warning sticker to the aircraft that threatened prosecution if tampered with, and subsequent video footage showed a male, believed to be defendant, tampering with the sticker and placing paperwork in the aircraft [*Id.*]. The RPSR states that no formal charges for this conduct have been filed [*Id.*].

Defendant objects that the facts in Paragraph 20 have not been established by the evidence, and he demands "strict proof" of these facts [Doc. 199, p. 2]. Defendant also

9

objects to the facts in Paragraph 106, arguing that there is no evidence to identify defendant, and this is not criminal conduct as per the elements of the alleged offense [*Id.* at 4].

The government responds that the probation office's petition reveals that defendant failed to obtain permission to travel outside of the Middle District of Florida [Doc. 188, pp. 18–19]. The government also counters that the Court, in its pretrial release revocation and detention order, found probable cause to believe that defendant committed a felony by removing the customs seal on an aircraft at the DeLand Municipal Airport [*Id.* at 19].

As a preliminary matter, the Court notes that defendant's objections in this regard are a "bare denial" because he had not presented any "evidence that calls the reliability or correctness of the alleged facts into question." *Lang*, 333 F.3d at 681 (6th Cir. 2003) (quoting *Mustread*, 42 F.3d at 1102). However, there is sufficient evidence in the record supporting the facts contained in Paragraphs 20 and 106.

First, defendant's assertion that facts related to his permission to travel have not been established by the evidence is contradicted by the USPO's petition for action on conditions of pretrial release, which states:

> [T]he defendant failed to obtain permission for planned travel outside of the Middle District of Florida. On or about August 5, 2024, the defendant provided a copy of a Delta flight itinerary to USPO Charles Sweat for travel from Atlanta, Georgia, to Chicago, Illinois, for that same date. Defendant Ross failed to provide his complete travel plans to the officer, including his return date. On August 6, 2024, USPO Sweat checked his GPS monitoring device and noticed he was no longer in Chicago, Illinois, and was traveling at a high rate of speed, commonly associated with air travel. The officer checked FlightAware, a website that displays public flight information and confirmed an aircraft was currently flying on a route matching the GPS coordinates of the defendant. Defendant Ross did not have permission to leave Chicago or to travel on another aircraft at that time.

[Doc. 68, p. 2].

Second, Paragraph 106 is supported by the order of detention, in which Judge McCook found "probable cause to believe that Defendant Ross has committed a federal felony by removing, breaking, and defacing the customs seal on an airplane at the DeLand Municipal Airport" [Doc. 94, p. 13]. Accordingly, defendant's objections to Paragraphs 20 and 106 of the RPSR are **OVERRULED**.

### 5. Criminal History

Paragraphs 100 through 103 of the RPSR contain facts related to defendant's criminal convictions in Ontario, Canada [*See* RPSR ¶¶ 100–103]. Specifically, the RPSR provides that defendant was convicted of making false representations when his license was suspended, willfully exercising pilot privileges when his license was suspended, willfully acting as a pilot-in-command when his license cancelled, and failing to comply with recognizances in the Ontario Court of Justice [*Id.*].

Defendant "objects to the criminal history representations as listed in paragraphs number 100 through 103[,]" and he "demands strict proof thereof" [Doc. 199, p. 4].

The government responds that although defendant's objection is a bare denial, the adult conditional sentence order issued by the Ontario Court of Justice shows defendant's criminal history in Canada as set forth in the RPSR [Doc. 188, p. 19].

At the outset, the Court finds that defendant's objections to Paragraphs 100 through 103 of the RPSR are conclusory and amount to nothing more than a "bare denial." *Lang*, 333 F.3d at 681 (quoting *Mustread*, 42 F.3d at 1102). Defendant has produced nothing to contradict any of the evidence in the RPSR related to his Canadian criminal history, nor

11

has he presented any "specific allegations of factual inaccuracy." *Chee*, 514 F.3d at 1115 (internal quotation marks and citation omitted).

However, there is evidence to substantiate these facts. Specifically, the Adult Conditional Sentence Order issued by the Ontario Court of Justice demonstrates that defendant was convicted of making false representations when his license was suspended, willfully exercising pilot privileges when his license was suspended, willfully acting as a pilot-in-command when his license cancelled, and failing to comply with recognizances [Doc. 188-7]. As a result, defendant was sentenced to four months' home confinement and ordered to perform 80 hours of community service [*Id.*]. Given that he has not produced any proof to contradict this evidence, defendant's objections to Paragraphs 100 through 103 of the RPSR are **OVERRULED**.

### 6. Relevant Conduct

Paragraphs 25 through 70 of the RPSR contain summaries of the offense conduct in this case, drawn from evidence from the forfeiture proceedings on March 7, 2025, and June 17, 2025 [RPSR ¶¶ 25–70]. Paragraphs 44 through 48 and 51 through 70 contain "relevant conduct" used to calculate defendant's base offense level under the Sentencing Guidelines [*Id.* ¶¶ 44–48, 51–71]. Paragraphs 71 through 73 contain additional information regarding victim impact in this case [*Id.* ¶¶ 71–73].

Defendant objects to Paragraphs 44 through 48 and 51 through 71 of the RPSR, arguing that the RPSR erred in considering "relevant conduct" to justify the application of sentencing enhancements under §§ 2B1.1(b)(1)(G), 2B1.1(b)(2)(A)(i), 2B1.1(b)(16)(A), and 3B1.3 of the Sentencing Guidelines [*See* Doc. 199]. Specifically, he argues that the

12

RPSR erred in referencing aircraft other than N6522Q and victims other than "R.P." in Paragraphs 51 through 70 [*Id.* at 1–2]. He contends that any facts mentioning aircraft sales or fraudulent activity involving aircraft or victims not identified in Count Three of the indictment or the plea agreement should be excluded from the RPSR [*Id.*]. Defendant also demands "strict proof" of the facts in Paragraphs 44 through 48 and 51 through 71 [*Id.* at 2, 4].

At Phase I of the sentencing hearing, defendant further contested the RPSR's inclusion of multiple transactions, alleged victims, and loss theories as "relevant conduct," arguing that he entered a "blind plea" because he pleaded guilty to one count of wire fraud, involving one transaction and one victim. Defendant asserted that the RPSR's use of "relevant conduct" recreates the conspiracy to commit an offense against the government count, and he did not plead guilty to such. Finally, defendant argued that his due process rights were violated because the RPSR's inclusion of "relevant conduct" increased his sentencing exposure.

The government responds that the RPSR correctly relies on relevant conduct because defendant's guilty plea, evidence at the forfeiture hearing, and defendant's recorded phone conversations show that he was involved in a scheme to defraud [Doc. 188, p. 4].

The probation officer responds that defendant should be held accountable for all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction [Doc. 194, p. 3]. The probation officer states that defendant's conduct is like the instant offense of conviction because he falsely advertised aircraft or

13

aircraft parts for sale by misrepresenting the condition of the aircraft or parts [*Id.*]. She notes that defendant documented false annual inspections in the aircraft's logbooks, his co-defendant, James Markey, certified the false logbook entries, and defendant then provided the false logbooks to the aircraft buyers [*Id.*]. Further, the probation officer notes that defendant's conduct occurred repeatedly as he "fraudulently sold at least 15 aircraft and three aircraft engines, resulting in at least 15 identified victims" [*Id.*]. Additionally, she asserts that defendant completed the sales within two years without interruption [*Id.*].

### a. Whether Relevant Conduct may be Considered

The Court first turns to the issue of whether relevant conduct may be considered for sentencing purposes. "[I]t is well settled in this circuit that conduct forming the basis for counts dismissed pursuant to a plea agreement may be considered in determining a defendant's base offense level under the Sentencing Guidelines." *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996); *United States v. Partington*, 21 F.3d 714, 717 (6th Cir. 1994) ("Conduct which forms the basis for counts dismissed pursuant to a plea bargain may be considered in determining the base offense level under the guidelines."); *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013) ("[R]elevant conduct is not limited to conduct for which the defendant has been convicted[.]") (citation omitted)).

Thus, defendant's offense conduct may be included in his offense level as "relevant conduct" if it is "part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Hill*, 79 F.3d at 1481 (quoting U.S. SENT'G GUIDELINES MANUAL § 1B1.3(a)(2)). "To qualify as part of a 'common scheme or plan' under the 'relevant conduct' guideline, the offenses 'must be substantially connected to each other by at least

14

one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*.'" *Id.* (quoting U.S. SENT'G GUIDELINES MANUAL § 1B1.3, application note 9(A)) (emphasis in original). Likewise, courts consider factors in determining whether offenses are part of the "same course of conduct," including "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *United States v. Maken*, 510 F.3d 654, 657 (6th Cir. 2007) (quoting U.S. SENT'G GUIDELINES MANUAL § 1B1.3 cmt. n.9).

Upon a review of the record, the Court finds that the government has established, by a preponderance of the evidence, that defendant's offense conduct outlined in Paragraphs 44 through 48 and 51 through 70 of the RPSR constitute "relevant conduct" regarding his wire fraud conviction. First, the similarity requirement is met because the offenses are based on the same conduct—misrepresentation of the condition of aircraft or aircraft parts to induce buyers to enter sales contracts. Specifically, the factual basis in the plea agreement supporting the wire fraud conviction states that defendant advertised and sold aircraft N6522Q to "R.P." who executed a wire transfer to defendant's bank account [Doc. 118, pp. 2–3]. After the aircraft was delivered, the emergency locator transmitter ("ELT") was inoperative, and the oil filter was rusty despite logbook entries documenting a properly functioning ELT and a newly replaced oil filter [*Id.* at 4]. Defendant also failed to deliver an airworthiness certificate or registration to R.P. [*Id*].

Likewise, the "relevant conduct" contained in the RPSR indicates that defendant documented false annual inspections in aircraft logbooks to make several aircraft seem more valuable [*See* RPSR ¶¶ 44–48, 51–70]. Several of the aircraft were flown in poor

15

conditions and were not airworthy [*Id.* ¶ 43]. To accomplish this scheme, Markey, who was a mechanic with inspection authority and was certified by the FAA, certified the false logbook entries for several aircraft in which he did not complete the inspections [*Id.*]. Defendant then provided false logbooks to aircraft purchasers and often failed to provide all legal documentation for the aircraft or aircraft parts [*Id.* ¶¶ 44–48, 51–71]. In addition, defendant falsified receipts and offered flight instructions to buyers as an incentive for purchasing aircraft [*Id.* ¶¶ 45–48, 64–66]. Thus, defendant's conduct involved the same *modus operandi*: misrepresenting the condition of aircraft to induce buyers to purchase aircraft.

Next, the regularity requirement is met because defendant's conduct was not isolated or sporadic. *See United States v. Powell*, 124 F.3d 655, 666 (5th Cir. 1997) (finding that the regularity requirement was met where the defendant's conduct "was not made up of isolated and sporadic incidents"). Rather, the RPSR identified at least 15 victims and calculated a total loss of $511,096.28, resulting from defendant's fraudulent sale of at least 15 aircrafts and 3 aircraft engines [*See* RPSR ¶¶ 44–48, 51–71, 88].

Finally, defendant's conduct occurred between approximately April 2022 and April 2024, with little interruption, demonstrating a short "time interval between the offenses" [*Id.*]. *See Maken*, 510 F.3d at 659 (finding that the "temporal proximity, similarity, and regularity" of the defendant's federal and state tax offenses demonstrated that the offenses formed the same "course of conduct"). Therefore, the Court finds that defendants' conduct outlined in Paragraphs 44 through 48 and 51 through 70 of the RPSR constitutes "relevant conduct" for purposes of sentencing.

The Court also notes that, in the plea agreement, the parties agreed to certain facts that satisfy the offense elements for wire fraud [Doc. 118]. The plea agreement provides that "[t]hese are the facts submitted for purposes of the defendant's guilty plea" [*Id.* at 2]. It notes that these facts "do not necessarily constitute all the facts in the case" and "[o]ther facts may be relevant to sentencing" [*Id.*]. Defendant and the government "retain[ed] the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case" [*Id.*]. Thus, the plea agreement demonstrates that defendant was on notice that facts outside of the plea agreement could be introduced and considered for the purposes of the sentencing hearing. As a result, the Court will not limit its analysis of defendant's base offense level to facts contained in Count Three of the indictment or the plea agreement.

Turning to defendant's due process argument, the Court notes that although "due process requires that *some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of . . . conduct as relevant to sentencing," *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (emphasis in original), this standard is a "relatively low hurdle." *United States v. Greene*, 71 F.3d 232, 235 (6th Cir. 1995). In addition, sentencing judges are not limited to information that would be admissible at trial in determining the relevant facts. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may . . . consider for the purpose of imposing an appropriate sentence."); *Witte v. United States*, 515 U.S. 389, 397–401 (1995) (noting that judges consider a wide range of information without the procedural protections of a criminal trial in sentencing a defendant); *Nichols v. United States*, 511 U.S. 738, 747

17

(1994) (noting that a sentencing judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come" (citation omitted)). Rather, the court may consider any information if it has a sufficient indica of reliability. *See Witte*, 515 U.S. at 399–401.

Given that the conduct in the RPSR is based on evidence and testimony from the forfeiture hearing, there appears to be at least "*some* evidentiary basis beyond mere allegation" to support the Court's consideration of these facts. *See Silverman*, 976 F.2d at 1504 (emphasis in original). Thus, the "relatively low hurdle" is met, and there is no due process violation here. *See Greene*, 71 F.3d at 235. Accordingly, defendant's objections related to the Court's consideration of "relevant conduct" are **OVERRULED.**

### b.      Strict Proof

The Court now turns to defendant's demands for "strict proof" of the facts in Paragraphs 44 through 48 and 51 through 71 [Doc. 199, pp. 2, 4]. By way of background, Matthew DeVane, an agent with the Department of Transportation Office of the Inspector General, testified at the forfeiture hearing regarding his investigation of defendant's sale of several aircraft identified in Paragraphs 44 through 48 and 51 through 62. Specifically, Agent DeVane used a summary chart he created to testify about the proceeds that defendant received for 12 aircraft he sold and the corresponding wire transfers of those proceeds. He testified that the information in his chart is based on his unrecorded interview with Markey, his conversations with aircraft purchasers, aircraft logbook entries, defendant's bank account records, and other documentation provided by aircraft mechanics and purchasers. There was no testimony at the forfeiture hearing regarding the facts in Paragraphs 63

18

through 71 of the RPSR. As explained below, defense counsel questioned Agent DeVane regarding several of these facts at Phase I of the sentencing hearing.

### i.      Paragraph 44

Paragraph 44 provides that a false annual inspection was documented in the logbook entries for aircraft 241NY [RPSR ¶ 44]. Paragraph 44 states that Beniam Astatkie sent a wire transfer of $55,000 to defendant for aircraft 241NY, and then Jason Shields, a mechanic, completed numerous repairs totaling $11,840.68 for the aircraft [*Id.*]. Further, Paragraph 44 notes that, had a proper annual inspection been completed on May 21, 2022, aircraft 241NY would not have met the inspection requirements [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that he interviewed Astatkie, who stated that he paid defendant $55,000 for aircraft N241NY, and then defendant stopped communicating with him. Agent DeVane also testified that Markey said he did not complete a proper annual inspection for aircraft N241NY, yet the maintenance logbook for the aircraft indicated that the inspection was completed properly. Agent DeVane testified that defendant's bank account records show that Astatkie issued a wire transfer to defendant for $55,000 on May 25, 2022, two weeks after defendant's bank account opened. Agent DeVane stated that Astatkie reported paying $60,000 for the aircraft, but Agent DeVane could not find the alleged $5,000 down payment in defendant's bank records, so he listed $55,000 as the amount for that aircraft on his chart. Based on Agent DeVane's testimony and defendant's bank records, the Court finds that there is sufficient evidence supporting the facts in Paragraph 44.

### ii.     Paragraphs 45 through 48

Next, Paragraphs 45 through 48 of the RPSR relate to the sale of aircraft N2473H [RPSR ¶¶ 45–48].  Paragraph 45 provides that Steve Blackwell wired defendant $23,740 for the purchase of this aircraft [*Id.* ¶ 45].  As part of this purchase, defendant agreed to conduct a Biennial Flight Review ("BFR") of Blackwell [*Id.*].  Paragraph 46 states that defendant intended to deliver the aircraft to Blackwell on June 14, 2022, but an emergency landing was made in a field, and the aircraft was ultimately delivered on June 15, 2022 [*Id.* ¶ 46].  Paragraph 46 notes that defendant conducted the BFR of Blackwell on June 20, 2022 [*Id.* ¶ 46].  A few days later, Blackwell attempted to report several mechanical issues to defendant, but defendant stopped responding [*Id.*].  Additionally, Paragraph 47 notes that defendant failed to provide a Bill of Sale from the previous owner, and he eventually refunded Blackwell $22,000 [*Id.*].  Paragraph 48 provides that the net economic loss to the victim of $1,740 was used to calculate the loss amount for this aircraft [*Id.* ¶ 48].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that on June 23, 2022, Blackwell sent defendant a wire transfer of $23,740 for aircraft N2473H, and Markey indicated he performed an incorrect annual inspection for the aircraft.  Agent DeVane stated that the maintenance logbook for aircraft N2473H noted that a proper annual inspection was completed.  Agent DeVane also testified that Blackwell's wire transfer of $23,740 appears in defendant's bank account records.  He stated that defendant returned $22,000 to Blackwell for the aircraft and thus, he did not include this amount in his chart as part of the money defendant obtained from his scheme to defraud.

20

At the continuation of the hearing on June 17, 2025, Agent DeVane also testified that he interviewed Blackwell, and he spoke with Markey regarding aircraft N2473H [Doc. 179, p. 30]. He testified that he has seen pictures of logbook entries for the aircraft purchased by Blackwell [*Id.* at 34]. Moreover, the government's sentencing memorandum includes a photograph of Blackwell's pilot logbook, which was signed by defendant to certify BFR completion [Doc. 188, p. 10]. Additional photographs taken on July 27, 2022, show damage to aircraft N2473H's fuselage [*Id.* at 14]. Based on this testimony, the Court finds that there is sufficient evidence supporting the facts in Paragraphs 45 through 48.

### iii. Paragraph 51

Paragraph 51 of the RPSR provides that a false annual inspection dated June 16, 2022, was documented in the logbook entries for aircraft N12JM [RPSR ¶ 51]. It notes that Kevin Thacker sent defendant two wire transfers for this aircraft on July 6, 2022, and July 21, 2022, respectively, which totaled $54,700 [*Id.*]. Paragraph 51 also states that although aircraft N12JM had numerous mechanical issues, Thacker has not been included as a victim in this case because a loss amount has not been determined [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that Markey stated in an interview that he did not complete a proper annual inspection for aircraft N12JM. Agent DeVane testified that defendant's bank records demonstrate that Thacker sent defendant two wire transfers of $27,350 each for the sale of this aircraft. Thus, the Court finds that there is sufficient evidence supporting the facts in Paragraph 51.

### iv.     Paragraph 52

Paragraph 52 of the RPSR provides that a false annual inspection dated April 20, 2022, was documented in the logbook entries for aircraft N58248 [RPSR ¶ 52]. The RPSR notes that James Deiman wired defendant $11,200 for this aircraft on July 7, 2022, but defendant crashed this aircraft during delivery [*Id.*]. Paragraph 52 also states that defendant wired a refund of $11,200 to Deiman on July 13, 2022, and Deiman has not been included as a victim in this case because an actual loss has not been determined [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that Deiman wired defendant $11,200 on July 7, 2022, as evidenced by defendant's bank account records. Agent DeVane also stated that aircraft N58248 crashed with defendant on board one day after Deiman sent defendant the wire transfer. Further, Agent DeVane testified that defendant eventually returned $11,200 to Deiman, and thus, he did not include this amount on his chart as money that defendant obtained from his scheme to defraud. Thus, the Court finds that there is sufficient evidence supporting the facts in Paragraph 52.

### v.     Paragraph 53

Paragraph 53 of the RPSR indicates that a false annual inspection dated April 1, 2022, was documented in the logbook entries for aircraft N7018D [RPSR ¶ 53]. Paragraph 53 notes that on July 25, 2022, Michael Hoeksel wired defendant $11,000 for the purchase of aircraft N7018D, which was advertised online as in "flying condition" [*Id.*]. The RPSR reports that Hoeksel experienced significant issues with this aircraft after he took possession, and although repairs totaling $3,000 have been made, the aircraft is not airworthy [*Id.*].

22

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that Markey indicated that he did not properly complete the annual inspection for aircraft N7018D. Further, Agent DeVane stated that Hoeksel sent defendant a wire transfer of $11,000 for the aircraft, as evidenced by defendant's bank account records. Therefore, there is sufficient evidence supporting the facts in Paragraph 53.

### vi. Paragraphs 54 through 56

Paragraph 54 of the RPSR provides that false logbook entries were provided in relation to the sale of aircrafts N65742 and N717G, which were purchased by Keith Furlong [RPSR ¶ 54]. The RPSR notes that Furlong gave defendant a cashier's check for $63,000 to purchase aircraft N65742 [*Id.*]. Paragraph 55 notes after Furlong took possession of the aircraft, Michael Struble, Airframe and Powerplant ("A&P") certified mechanic, found birds' nests, dirt, straw, and birds' corpses in the fuselage and wings of the aircraft [*Id.*]. Paragraph 55 also notes that the aircraft's logbook documented that an annual inspection was completed on August 4, 2022 [*Id.*]. Struble concluded that the debris negatively affected the aircraft's performance, and Furlong spent $7,000 repairing aircraft N65742 [*Id.*]. The RPSR provides that this aircraft is not airworthy, and it needs a new wing, the cost of which is estimated to be between $30,000 and $50,000 [*Id.*].

Paragraph 56 of the RPSR notes that on or about November 14, 2022, Furlong purchased aircraft N717G from defendant [*Id.* ¶ 56]. The RPSR provides that the logbook entries were misrepresented for aircraft N717G, and it had issues with the title, but there were no identifiable mechanical issues [*Id.*].

At the forfeiture hearing on March 7, 2025, DeVane testified that Markey indicated he did not complete the annual inspection for aircraft N65742 but signed that he did in the maintenance logbook. Agent DeVane testified that Furlong issued a $63,000 check dated August 4, 2022, to purchase this aircraft. Further, Agent DeVane identified a photograph of the cashier's check issued by Furlong showing the $63,000 deposit to defendant, which was entered into evidence as Exhibit 2A. Additionally, Agent DeVane testified that defendant's bank account records show that Furlong sent defendant a wire transfer of $96,500 for aircraft N717G on November 14, 2022. And the government's sentencing memorandum includes photographs of aircraft N65742 showing that its fuselage and wings contained birds' nests, dirt, straw, and bird corpses [Doc. 188, pp. 12–13]. Thus, there is sufficient evidence supporting the facts in Paragraphs 54 through 56.

### vii.     Paragraph 57

Paragraph 57 of the RPSR provides that a false annual inspection dated August 17, 2022, was documented in the logbook entries for aircraft N28FF [RPSR ¶ 57]. Paragraph 57 notes that David Caicedo, an FAA certified private pilot and A&P mechanic, sent defendant four wire transfers totaling $39,500, in August and September of 2022, for the purchase of aircraft N28FF [*Id.*]. Paragraph 57 indicates that the logbooks for aircraft N28FF contained false statements, the aircraft was in poor condition, and Caicedo spent approximately $20,000 repairing the aircraft [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that he spoke with Caicedo directly, and Caicedo issued multiple wire transactions to defendant for the purchase of aircraft N28FF. Specifically, Agent DeVane testified that Caicedo sent

24

defendant a wire transfer for $14,500, two wire transfers for $10,000, and a wire transfer for $5,000, as shown by defendant's bank account records. Thus, there is sufficient evidence supporting the facts in Paragraph 57.

### viii.    Paragraph 58

Paragraph 58 of the RPSR provides that a false annual inspection dated April 1, 2022, was documented in the logbook entries for aircraft N8439U [RPSR ¶ 58]. Paragraph 58 states that aircraft N8439U was advertised for sale on Facebook with a "fresh annual" [*Id.*]. It notes that Michael Molitor's son met with defendant and flew the aircraft, then Molitor purchased the aircraft for $60,000 on or about November 3, 2022 [*Id.*]. After the purchase, a mechanic discovered that the annual inspection was lacking, and Molitor spent $10,000 repairing the aircraft [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that he interviewed Molitor, who indicated that he purchased aircraft N8439U from defendant. Agent DeVane testified that this aircraft's maintenance logbook indicated that a proper annual inspection was completed, but Markey informed him that the annual inspection was not completed in compliance with FAA standards. Agent DeVane stated that Molitor indicated that he paid for the aircraft with a $60,000 check. He testified that he did not include the $60,000 check in his chart as part of the money defendant obtained from his scheme to defraud because he could not find the check. Thus, there is sufficient evidence supporting the facts in Paragraph 58.

### ix. Paragraph 59

Paragraph 59 of the RPSR provides that Jared Cobia sent defendant a wire transfer of $72,000 for aircraft N5852X [RPSR ¶ 59]. Paragraph 59 states that the logbook for this aircraft was falsified on November 1, 2022, and several mechanical issues with the aircraft were later discovered [*Id.*]. The RPSR notes that Cobia provided an itemized invoice for the repair costs, which totaled $8,415.60 [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that defendant's bank account records demonstrate that Cobia purchased aircraft N5852X from defendant for $72,000. Accordingly, there is sufficient evidence to support the facts in Paragraph 59.

### x. Paragraphs 60 through 62

Paragraph 60 of the RPSR provides that Daniel Roche paid defendant $57,000 for aircraft N172HT, and Roche made the purchase contingent on a pre-buy inspection and a new annual inspection [RPSR ¶ 60]. A Certified Flight Instructor ("CFI") inspected the aircraft and noted missing logbook information [*Id.*]. Paragraph 61 indicates that defendant signed Markey's signature on the logbook without Markey's permission [*Id.* ¶ 61]. Defendant completed $7,000 in repairs, refunded Roche $70,000, and re-took possession of the aircraft [*Id.*]. Paragraph 62 notes that Roche was not included as a victim in this case because an actual loss has not been determined [*Id.*].

At the forfeiture hearing on March 7, 2025, Agent DeVane testified that defendant's bank account records show that Roche paid defendant a 15% down payment of $8,550 for aircraft N172HT, and a loan company that provided the remaining funds to purchase the aircraft. Further, DeVane testified on cross-examination that he spoke to Roche regarding

26

his purchase of aircraft N172HT, and he has seen pictures of the logbook for this aircraft via text message [Doc. 179, pp. 30, 34]. Thus, there is sufficient evidence supporting the facts in Paragraphs 60 through 62.

### xi.  Paragraph 63

Paragraph 63 of the RPSR provides that AVZ Flight School Academy ("AVZ") filed a fraud complaint against defendant with the Osceola County, Florida, Sheriff's Office [RPSR ¶ 63]. According to the RPSR, AVZ sent defendant a wire transfer of $11,950 in response to an online advertisement for an aircraft engine [*Id.*]. Defendant subsequently agreed to sell AVZ 2 additional engines for 2 wire transfers of $10,000 and $18,000 [*Id.*]. The RPSR provides that AVZ later realized the first engine was corroded and was not in working condition as advertised [*Id.*]. AVZ did not receive the engine logbooks and reported a substantial amount of money would be needed to repair the engine [*Id.*]. AVZ never received the additional two engines and tried to contact defendant several times, but he stopped responding [*Id.*]. Paragraph 63 notes that AVZ requested a refund and received a mailed check from defendant's bank account for $28,000, but AVZ was notified that the money was turned due to "account frozen/blocked" [*Id.*].

At Phase I of the sentencing hearing, Agent DeVane testified that he began investigating defendant's dealings with AVZ due to records he subpoenaed from the Osceola County, Florida, Sheriff's Office. Agent DeVane testified that he spoke with the owner of AVZ and several victims in October of 2025. Agent DeVane stated that the owner of AVZ informed him that he received a $28,000 check from defendant that was purported to be a refund, but the account was closed, and he did not receive any of the

funds from the check. Based on the records he obtained from Osceola County and his own investigation, Agent DeVane concluded that AVZ suffered a loss of $28,000. Therefore, there is sufficient evidence to support the facts contained in Paragraph 63.

### xii.    Paragraphs 64 through 66

Paragraph 64 of the RPSR provides that Agent DeVane interviewed Brent Harmon and Melissa Middleton regarding their purchase of aircraft N421GE from defendant in August 2023 [RPSR ¶ 64]. Paragraph 64 notes that defendant told Harmon that an annual inspection was completed, and a mechanic would complete additional maintenance [*Id.*]. As part of the Bill of Sale, defendant offered to provide 30 hours of flight training for Harmon's son [*Id.*]. Paragraph 64 also states that a verbal addendum to the sales agreement was made in which defendant offered to fly Harmon and Middelton in aircraft N421GE [*Id.*]. On August 22, 2023, Middleton took a flight in aircraft N8787D with defendant, who acted as the pilot in command [*Id.*]. Paragraph 65 of the RPSR states that Harmon paid defendant $1,000 in cash as a deposit and then sent a wire transfer of $99,000 to defendant for aircraft N421GE on August 22, 2023 [*Id.*]. The RPSR states that the aircraft has failed all inspections since Harmon purchased it, and he has spent approximately $12,000 repairing it [*Id.*]. Paragraph 66 notes that on August 9, 2023, a propeller fell off the aircraft while defendant and Logan Scott Cornstubble were flying in it [*Id.*].

At Phase I of the sentencing hearing, Agent DeVane testified that Middleton and Harmon paid defendant $1,000 as a deposit for aircraft N421GE and spent $12,000 repairing it. He stated that this aircraft is not airworthy, and Middleton and Harmon do not feel that they can sell the aircraft because the records are unreliable. Agent DeVane

testified that Middleton and Harmon told him that there were misrepresentations in the aircraft's maintenance records, and a mechanic informed them that a significant amount of the maintenance was fabricated. Agent DeVane testified that as part of this transaction, defendant promised Middleton and Harmon that he would provide flight lessons through his flight school, and defendant then gave Middleton a ride in one of his planes. He testified that defendant did not have a pilot's certificate at that time.

Moreover, this transaction is evidenced by the photograph of the handwritten agreement signed by Harmon and defendant, which is dated August 20, 2022 [Doc. 188, p. 11]. The agreement labels "CESSNA 421 GE" as "SOLD" and it provides the serial number of the aircraft [*Id.*]. The agreement also indicates that a deposit of $1,000 cash was made with "$99,000 owing wired," and it states that the sale includes 20 hours of private pilot lessons for Harmon's son [*Id.*]. This agreement clearly labels defendant as the "seller" and Harmon as the "buyer" [*Id.*]. Moreover, in a recorded interview with Agent DeVane, defendant admitted that he flew Middleton in aircraft N8787D as part of this transaction:

> [Agent DeVane:] And then you got in an airplane, what, 8787 Delta? And took her for a ride. Is that accurate?
>
> [Defendant:] I don't recall that.
>
> [Agent DeVane:] She's got video of it. You don't have a pilot's certificate right? So that's maybe something we can both agree.
>
> [Defendant:] Yeah, we can both agree, shouldn't have done that.

[Doc. 188-4, p. 46].

Regarding Paragraph 66 of the RPSR, the government's sentencing memorandum states that on August 9, 2023, Zach Barrett, a lieutenant with the Walton County Sheriff's

Office, investigated a propeller found in Jersey, Georgia that had fallen off aircraft N421GE [Doc. 188, p. 15]. The government notes that defendant told Barrett that he was a flight instructor at a flight school he owned, and he was flying in aircraft N421GE with his student, Cornstubble [*Id.*]. Cornstubble and defendant identified themselves as the pilot in command and passenger, respectively [*Id.*]. The government also states that defendant reported that he fell asleep and was startled awaken by Cornstubble when the propeller fell off the plane [*Id.*]. The government's sentencing memorandum includes an image of the damaged propeller [*Id.*].

Lastly, the government asserts that Agent DeVane was informed by David Detscher, Assistant Principal Maintenance Inspector of the Atlanta Flight Standards Office, that on August 11, 2023, he responded to the Monroe-Walton County Airport in Monroe, Georgia, and he investigated the incident involving aircraft N421GE [*Id.*]. Detscher determined that the engine's propeller's bolts had sheared off, resulting in the propeller's departure from the aircraft during flight [*Id.*]. Accordingly, there is sufficient evidence supporting the facts in Paragraphs 64 through 66.

### xiii.    Paragraphs 67 through 69

Paragraph 67 of the RPSR provides that on November 16, 2023, defendant and James McBride signed a contract agreeing to the sale of aircraft N467DM for $237,660, and then McBride paid approximately $2,440 in fees [RPSR ¶ 67]. Paragraph 68 notes that McBride subsequently came to inspect the aircraft, which was in a state of disrepair and did not match the images sent from defendant to McBride [*Id.* ¶ 68]. Paragraph 69 states that a warrant was issued on August 5, 2024, charging defendant with Scheme to Defraud

30

Over $50,000 and Grand Theft Auto Over $100,000 in the Circuit Court of Osceola County, Floria [*Id.* ¶ 69].

The RPSR notes that information related to aircraft N467DM was obtained from the United States Attorney's file as well as the probation officer's conversations with Agent DeVane regarding this case [RPSR ¶ 40]. Moreover, the Court "may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings." *House*, 872 F.3d at 752 (citing *Mustread*, 42 F.3d at 1102). Defendant has not pointed to any evidence that contradicts the RPSR's findings in this regard, and the Court is entitled to rely on the RPSR's findings. Regarding defendant's demand for "strict proof" of the facts in Paragraph 69, the Court has already addressed this request above. *See supra* Section III.A.3.

### xiv. Paragraph 70

Paragraph 70 of the RPSR provides that a mechanic started an inspection of aircraft N82578 and concluded that it had a cracked spar [RPSR ¶ 70]. Based on this, the previous owner did not repair the aircraft, and the annual inspection was never completed [*Id.*]. The RPSR states that defendant later took possession of this aircraft, and a false annual inspection was completed and documented in its logbook entries [*Id.*]. On April 2, 2024, the defendant sold the aircraft to Calvin Moser for $20,000, and the cracked spar was reportedly never fixed [*Id.*].

At Phase I of the sentencing hearing, Agent DeVane testified that Moser purchased aircraft N82578 after a mechanic conducted an incomplete annual inspection and discovered that the aircraft had a cracked spar. Agent DeVane testified that the aircraft is

31

not "flyable," and the cracked spar resulted in a loss to Moser. Accordingly, there is sufficient evidence supporting the facts in Paragraph 70.

## xv. Paragraph 71

Finally, defendant demands "strict proof" of the facts in Paragraph 71 [Doc. 199, p. 3].[2] Paragraph 71 of the RPSR provides that the provisions of the Mandatory Victim Restitution Act of 1996 apply, and it identifies a list of victims based on the relevant conduct as set forth above [*Id.*]. As explained, there is ample evidence to support the RPSR's facts pertaining to relevant conduct in this case, and the Court "may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings." *House*, 872 F.3d at 752 (citing *Mustread*, 42 F.3d at 1102). Defendant has not presented any evidence to contradict the RPSR's findings in this regard, and thus, the Court is entitled to rely on the RPSR.

## B. Loss Amount

Paragraph 88 of the RPSR calculates a total loss amount of $511,096.28 and adds a 12-level enhancement under § 2B1.1(b)(1)(G) because "the total loss amount exceeded $250,000, but was less than $550,000" [RPSR ¶ 88]. Paragraphs 44 through 48 and 51 through 70 of the RPSR set forth the offense conduct supporting the application of this enhancement [*Id.* ¶¶ 44–48, 51–70]. As noted above, Paragraph 71 identifies at least 12 victims based on the offense conduct [*Id.* ¶ 71].

---

[2] Although Paragraph 71 does not explicitly include "relevant conduct," defendant lumps this objection in with his other objections to relevant conduct [See Doc. 199, p. 3].

Defendant objects to any loss amount in the RPSR exceeding $6,500 as unsupported by the indictment and objects to Paragraph 88 on the grounds that the indictment and plea agreement indicate that the loss amount is based solely on the sale of aircraft N6522Q [Doc. 199, pp. 2, 4]. At Phase I of the sentencing hearing, defendant also argued that there are several discrepancies related to values and loss amounts in this case. As an example, defendant stated that the loss values in Paragraphs 44 through 70 do not match the restitution values listed in Paragraph 137 of the RPSR.

Defendant also maintained that even if the Court looks at conduct other than facts related to aircraft N6522Q, the loss amount falls below the minimum threshold for the 12-level enhancement under § 2B1.1(b)(1)(G). Specifically, defendant argued that three aircraft, N421GE, N467DM, and N82578, and three aircraft engines sold to AVZ, were not discussed at the forfeiture hearing but were added to the RPSR [*See* RPSR ¶¶ 63–70]. Defendant asserted that, excluding the loss amounts related to these aircraft and engines, the total loss amount is less than $250,000.

The government argues that the RPSR properly calculates the loss amount because the Court may consider all acts and omissions that were part of the same course of conduct as the offense of conviction to calculate the loss amount [Doc. 188, p. 6]. At Phase I of the sentencing hearing, the government asserted that it did not have to present proof of every single aircraft at the forfeiture hearing, and restitution is based on the victim's loss, not necessarily the defendant's gain.

Section 2B1.1 of the Sentencing Guidelines "enhances a defendant's sentence to correlate to the amount of loss caused [by] his fraud." *United States v. Triana*, 468 F.3d

33

308, 319 (6th Cir. 2006). Under this section, a loss amount of more than $250,000 results in a 12-level enhancement. U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(1)(G) (U.S. SENT'G COMM'N 2025). "The court need only make a reasonable estimate of the loss[,]" and "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.* § 2B1.1(b)(1)(G), cmt. n.3(B); *see also United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) ("When applying section 2B1.1(b)(1) to determine the amount of loss, the district court 'need only make a reasonable estimate' of the amount." (citation omitted)). The government has the burden to prove the loss amount by a preponderance of the evidence. *Jones*, 641 F.3d at 712; *see also United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir. 1994) (determining that the government must prove the drug quantity by a preponderance of the evidence). "In calculating the Guidelines loss under U.S.S.G. § 2B1.1(b)(1), district courts include losses sustained from relevant conduct under § 1B1.3." *United States v. Abegunde*, 841 F. App'x 867, 878 (6th Cir. 2021) (quoting *Catchings*, 708 F.3d at 720).

Having found that the offense conduct contained in Paragraphs 44 through 48 and 51 through 70 of the RPSR constitutes "relevant conduct," the Court is not limited to the facts contained in Count Three of the indictment or the plea agreement in determining the loss amount. *See supra* Section III.A.5. In particular, the Court considers facts related to aircraft N421GE, N467DM, and N82578, and the three aircraft engines sold to AVZ, as part of the "relevant conduct" regarding defendant's wire fraud conviction [*See* RPSR

34

¶¶ 63–70].[3]  Moreover, it is immaterial that these aircraft and engines were not discussed at the forfeiture proceeding because forfeiture and loss amount calculations are two distinct concepts.  *Compare United States v. Boring*, 557 F.3d 707, 714 (6th Cir 2009) (stating that "forfeiture is based on the offender's gain" and not on a victim's loss), *with Triana*, 468 F.3d at 319 (explaining that under § 2B1.1, a defendant's sentence may be enhanced "to correlate to the amount of loss caused [by] his fraud" to the victim).  In other words, the government did not forfeit its ability to seek a sentencing enhancement for the loss amount by failing to introduce loss evidence at the forfeiture proceeding because forfeiture serves a different purpose.  Therefore, the Court finds that the RPSR did not err in relying on this conduct to support the application of the 12-level enhancement for the loss amount.

Additionally, the Court finds that the RPSR properly calculated the loss amount.  Specifically, the RPSR assigns a loss of $11,840.68 for aircraft N241NY, which represents that total cost of repairs incurred by Astatkie [RSPR ¶ 44].  Next, the RPSR assigns a loss of $1,740 for aircraft N2473H, which represents Blackwell's wire transfer of $23,740 less defendant's refund of $22,000 [*Id.* ¶¶ 45–48].  The RPSR shows a loss of $29,000 for aircraft N6522Q, which represents a wire transfer sent by R.P. to defendant for $21,000 and $8,000 spent to repair the aircraft [*Id.* ¶¶ 49–50].  The RPSR assigns a loss of $3,000 for aircraft N7018D, which represents the cost of repairs incurred by Hoeksel [*Id.* ¶ 53].

---

[3] The Court notes that the RPSR does not include a loss amount in the guideline calculation for one of the aircraft engines sold to the AVZ because an estimation for repairs has not been provided [RPSR ¶ 63].

In addition, the RPSR assigns a loss of $37,000 for aircraft N65742, which represents the $7,000 spent by Furlong to repair the aircraft and $30,000 for the estimated cost of a new wing [*Id.* ¶¶ 54–55]. The RPSR attributes a loss of $20,000 for aircraft N28FF, which represents the cost of repairs spent by Caicedo [*Id.* ¶ 57]. Moreover, the RPSR shows a loss of $10,000 for aircraft N8439U based on repair costs incurred by Molitor [*Id.* ¶ 58]. Further, the RPSR assigns a loss of $8,415.60 for aircraft N5852X based on Cobia's itemized invoice of repair costs [*Id.* ¶ 59].

Next, the RPSR also includes a loss of $28,000 for the aircraft engines purchased by AVZ, which cost $10,000 and $18,000, respectively [*Id.* ¶ 63]. The RPSR attributes a loss of $102,000 for aircraft N421GE, which represents the total amount of $100,000 that Harmon and Middleton paid defendant for the aircraft, plus $12,000 in repairs costs, minus the current value of the aircraft ($10,000) [*Id.* ¶ 65]. The RPSR attributes a loss of $240,100 for aircraft N467DM, which represents the $237,660 paid by McBride for the aircraft via wire transfer and $2,440 paid in fees [*Id.* ¶ 67]. Lastly, the RPSR assigns a loss of $20,000 for aircraft N82578 based on the cost Moser paid defendant for the aircraft [*Id.* ¶ 70]. Therefore, bearing in mind that the Court "need only make a reasonable estimate of the loss[,]" the RPSR properly calculates a total loss amount of $511,096.28 based on the evidence presented [RPSR ¶ 88]. *See Jones*, 641 F.3d at 712.

With respect to defendant's argument regarding the restitution values in Paragraph 137, "the guideline loss amount and restitution are two different things, which fulfill different functions." *United States v. Kronis*, No. 1:22-CR-282, 2025 WL 2444058, at *1 (N.D. Ohio Aug. 25, 2025). Therefore, "[t]here is no categorical rule that restitution must

36

be equal to or less than the amount of loss found when applying Sentencing Guidelines § 2B1.1(b)(1) or similar loss-based Guidelines sections." *United States v. Dadyan*, 76 F.4th 955, 959 (9th Cir. 2023); *see also United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 102–03 (2d Cir. 2014) (explaining that restitution serves a compensatory function and focuses on the victim while loss focuses on the defendant). Since the loss amount calculation and restitution serve different purposes, the government has met its burden to prove the loss amount by a preponderance of the evidence. *See Jones*, 641 F.3d at 712. Accordingly, defendant's objections related to the loss amount are **OVERRULED**.

### C. Number of Victims Enhancement

Paragraph 89 of the RPSR, which states that there are 15 identified victims, adds a 2-level enhancement under § 2B1.1(b)(2)(A)(i) because "the offense involved 10 or more victims" [RPSR ¶ 89].

Defendant objects to the application of this 2-level enhancement [Doc. 199, p. 4]. Defendant does not provide the basis for his objection [*Id.*].

The government responds that more than 10 purchasers qualify as victims because they suffered an actual loss [Doc. 188, p. 7]. The government submits that defendant has not presented evidence to contradict the victim list in the RPSR, and defendant's testimony at the forfeiture hearing shows that his scheme to defraud involved more than 10 victims [*Id.* at 8]. At Phase I of the sentencing hearing, the government also stated that Agent DeVane testified at the forfeiture hearing that there were more than 10 victims.

As previously noted, "defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth," and instead, "must produce some evidence that calls the

reliability or correctness of the alleged facts into question." *Lang*, 333 F.3d at 681 (quoting *Mustread*, 42 F.3d at 1102). Defendant has not met his burden to present evidence contradicting the accuracy of the list of victims identified in the RPSR or otherwise provided any support for the basis of his objection. And "[w]hen a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007); *see also United States v. Duckro*, 466 F.3d 438, 449 (6th Cir. 2006) (noting that a defendant who challenges the factual allegations in the PSR must present some evidence to call those facts into question); *Lang*, 333 F.3d at 682 (finding that the district court could make factual findings on the basis of the PSR where the defendant did not produce evidence to contradict those findings).

Nevertheless, the Court finds that the evidence in the record supports the application of § 2B1.1(b)(2)(A)(i), which applies a 2-level enhancement "[i]f the offense . . . involved 10 or more victims[.]" U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(2)(A)(i). A "victim" is "any person who sustained any part of the actual loss determined" under subsection (b)(1)." *Id.* § 2B1.1 cmt. n.1. "The phrase 'any part' casts a wide net and applies 'so long as a person suffers reasonably foreseeable pecuniary harm as a result of an offense.'" *United States v. Wala*, 166 F.4th 583, 602 (6th Cir. 2026) (quoting *United States v. Smith*, 749 F.3d 465, 485 (6th Cir. 2014)). "Reasonably foreseeable pecuniary harm is 'pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.'" *Id.* (quoting U.S. SENT'G GUIDELINES MANUAL § 2B1.1 table note (C)(iv)). "Pecuniary harm is 'harm that is monetary or that

38

Case 3:23-cr-00128-TAV-JEM   Document 220   Filed 08/06/26   Page 38 of 54
PageID #: 1674

otherwise is readily measurable in money.'" *Id.* (quoting U.S. SENT'G GUIDELINES MANUAL § 2B1.1 table note (C)(iii)).

As outlined in the "Offense Conduct" section of the RPSR, more than 10 aircraft purchasers suffered an actual loss in this case and thus qualify as victims under § 2B1.1(b)(2)(A)(i) [RPSR ¶¶ 25–70]. Further, having determined that the offense conduct in Paragraphs 44 through 48 and 51 through 70 of the RPSR constitutes "relevant conduct," for the purposes of sentencing, the RPSR did not err in identifying victims beyond R.P. *See supra* Section III.A.6.

Additionally, defendant's testimony at the forfeiture hearing on June 17, 2025, supports a finding that he defrauded more than 10 victims. At the hearing, defendant indicated that Markey performed annual inspections on 12 aircraft, and he filed a complaint with the FAA stating that Markey should not be working on airplanes after Markey "worked on 12 aircraft for [him]" [Doc 179, pp. 63–64]. Agent DeVane further testified that there are 12 victims in this case based on evidence of defendant's bank transfers, linking defendant to the aircraft transactions in a chart that he presented [*See* Doc. 179]. Specifically, Agent DeVane testified about the proceeds that defendant received for 12 aircraft and the corresponding wire transfers of those proceeds along with any amount returned to the purchaser [*Id.*]. Thus, the facts contained in the RPSR and the testimony and evidence presented at the forfeiture hearing demonstrate that defendant participated in a scheme to defraud more than 10 victims, who suffered an actual loss as a result. Thus, defendant's objections related to the 2-level enhancement under § 2B1.1(b)(2)(A)(i) in Paragraph 89 of the RPSR are **OVERRRULED**.

**D.      Risk of Death or Serious Bodily Injury Enhancement**

Paragraph 90 of the RPSR adds a 2-level enhancement under § 2B1.1(b)(16)(A) because "the offense involved the conscious or reckless risk of death or serious bodily injury" [RPSR ¶ 90].  In support of the application of this enhancement, the RPSR states that defendant fraudulently sold several aircraft by representing that they were airworthy and providing false logbooks [*Id.*].

Defendant objects that the facts in Paragraph 90 are not part of the indictment or plea agreement [Doc. 199, p. 4].  He submits that there is no proof that any aircraft that was flown subject to the terms of the agreement fits this enhancement [*Id.*].

The government counters that defendant consciously or recklessly created a risk of death or serious bodily injury by operating aircraft without a valid license, pretending to be a Certified Flight Instructor without the proper credentials, and selling unairworthy aircraft, many of which crashed en route to purchasers [Doc. 188, pp. 8–16].

Section 2B1.1(b)(16)(A) applies a 2-level enhancement "[i]f the offense involved . . . the conscious or reckless risk of death or serious bodily injury[.]"  U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(16)(A).  The Sentencing Guidelines define "serious bodily injury" as "involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  *Id.* § 1B1.1 cmt. n.1(L).

The Sixth Circuit has held that "[i]n a fraud case, this enhancement applies if the risk of serious bodily injury is 'part and parcel of the scheme to defraud.'"  *United States*

*v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020) (citing *United States v. Hall*, 71 F.3d 569, 571 (6th Cir. 1995)). "This enhancement does not require actual injury, but it does require that the reckless risk was 'actual, not conjectural.'" *Id.* (quoting *United States v. Vivit*, 214 F.3d 908, 922 (7th Cir. 2000)). In deciding whether this enhancement should apply, the Court must conduct a "fact-specific inquiry" because it "is intended to apply to a wide variety of conduct." *United States v. Luyten*, 966 F.3d 329, 334 (5th Cir. 2020) (quoting *United States v. Mata*, 624 F.3d 170, 174 (5th Cir. 2010)).

Here, defendant engaged in a scheme to defraud by operating several aircraft while his pilot's license was revoked, supporting a finding that his offense conduct involved "the conscious or reckless risk of death or serious bodily injury[.]" *See* U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(16)(A). Specifically, the Canadian Minister of Transport revoked defendant's private pilot license on March 16, 2018, due to "a series of aviation related safety issues and non-compliances" [Doc. 188-1]. The Transportation Appeal Tribunal of Canada upheld the Minister of Transport's decision to cancel defendant's pilot license on June 19, 2019 [Doc. 188-2].

Nevertheless, defendant continued to operate aircraft after his license was revoked, as evidenced by an Emergency Order of Revocation issued by the FAA on March 16, 2023 [Doc. 188-3]. *See Luyten*, 966 F.3d at 334 (finding that the offense involved a substantial risk of death or serious bodily injury where a pilot operated an aircraft while his license was revoked). This order indicates that on or about June 14, 2022, defendant operated aircraft N2473H as pilot-in-command and offered flight review instructions to Blackwell while his license was revoked [*Id.* at 5]. Defendant endorsed Blackwell's pilot logbook

41

entry by certifying the completion of the flight review [*Id.*]. As a result, the FAA concluded that defendant "operated N2473H in a careless or reckless manner as to endanger life or property of another" [*Id.*]. Thus, defendant's operation of aircraft N2473H without a license created a substantial risk of serious injury or death to Blackwell. *See Luyten*, 966 F.3d at 334 ("Operating an aircraft without satisfying the licensure requirements further compounds the substantial risk of serious injury or death to the passengers.").

The scheme to defraud is further shown by defendant's sale of aircraft N421GE to Harmon and Middleton [RPSR ¶¶ 64–65]. As part of the Bill of Sale, defendant offered to provide flight training for Harmon's son [*Id.* at 64]. On August 22, 2023, defendant acted as pilot in command and flew Middleton in aircraft N8787D [*Id.*]. In an interview with Agent DeVane on January 18, 2024, defendant agreed that he should not have done so without a pilot's license [Doc. 188-4, p. 46].

"The requirements for maintaining an airman certificate (pilot's license) are in place to ensure a pilot's competency and ongoing fitness to operate a plane safely." *See Luyten*, 966 F.3d at 334. "Airman certificates are only issued to individuals who are determined to be 'qualified and physically able to perform the duties related to the certified position.'" *Id.* (quoting *Ventress v. Japan Airlines*, 747 F.3d 716, 721 (9th Cir. 2014)). Thus, the totality of these specific facts supports the conclusion that defendant engaged in "inherently dangerous practices that produce[d] substantial risks of death or serious bodily injury[.]" *Id.* at 335 (quoting *United States v. Solis-Garcia*, 420 F.3d 511, 516 (5th Cir. 2005)).

Additionally, defendant's sale of unairworthy aircraft shows that he engaged in a scheme to defraud that created a risk of death or serious bodily injury. For instance, a post-purchase inspection of aircraft N2473H, which defendant sold to Blackwell, revealed that the aircraft's fuselage was damaged, rendering the aircraft unairworthy [Doc. 188-5]. *See United States v. Trusty*, 68 F. App'x 801, 802–03 (9th Cir. 2003) (finding that a defendant's conduct created a serious risk of death or bodily injury "because it caused damage to the aircrafts' back up systems, increasing the likelihood of a catastrophe").

Similarly, the annual inspection for aircraft N65742 certified that it was airworthy, but a post-purchase inspection conducted by Struble revealed that the fuselage and wings contained birds' nests, dirt, straw and bird corpses, and the airframe contained large amounts of debris [RPSR ¶ 55]. Struble found that the debris negatively affected the aircraft's performance and noted that if the aircraft was flown through a cloud or rainstorm, the added weight of the debris could have caused an increased chance of an accident [*Id.*]. *See United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 992–93 (9th Cir. 2001) (determining that a corporate defendant created a risk of serious bodily injury by intentionally selling airplane parts that it knew could be defective).

Likewise, at the forfeiture hearing Agent DeVane testified that aircraft N58248, sold by defendant, crashed on the way to the purchaser [Doc. 179, pp. 53–54; RPSR ¶ 52]. And on August 9, 2023, defendant was flying in aircraft N421GE with a flight student when a propeller fell off the plane [RPSR ¶ 66].

Thus, there is ample factual support for the application of this enhancement. And defendant has not produced any evidence to contradict the facts contained in the RPSR.

43

*See Lang*, 333 F.3d at 682 (finding that the district court could make factual findings on the basis of the PSR where the defendant did not produce evidence to contradict those findings). In relying on the record and the RPSR, the Court finds that defendant created a conscious or reckless risk of death or serious bodily injury resulting from his scheme to defraud aircraft purchasers. Accordingly, defendant's objection the 2-level enhancement under § 2B1.1(b)(16)(A) contained in Paragraph 90 of the RPSR is **OVERRRULED**.

### E.    Special Skill Enhancement

Paragraph 92 of the RPSR adds a 2-level enhancement pursuant to § 3B1.3 because "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense" [RPSR ¶ 92]. In support of the application of this enhancement, the RPSR states that, as part of various sales agreements, defendant agreed to conduct BFRs, identified himself as a certified flight instructor, and offered to provide flight training [*Id.*].

Defendant objects that the facts included in Paragraph 92 are not part of the indictment or Count Three in which defendant entered a plea [Doc. 199, p. 4].

The government responds that defendant possessed training and skills not otherwise possessed by average citizens [Doc. 188, p. 17]. In particular, the government asserts that defendant used his pilot skills to entice buyers by offering perks such as BFRs and flights lessons and knowingly flew a potential buyer in an aircraft without a license and signed another buyer's pilot logbook [*Id.*]. The government also states that, at the forfeiture hearing, defendant testified that he was apprenticing to become an A&P technician and was familiar with the paperwork needed for an annual inspection [*Id.* at 17–18]. Further,

the government maintains that defendant performed and oversaw the preventative maintenance on aircraft N6522Q [*Id.* at 18].

To the extent that defendant objects to the Court's reliance on "related conduct" outside of the plea agreement and Count Three of the indictment to apply this enhancement, the Court has already addressed this issue. *See supra* Section III.A.6. Regardless, the Court finds that the RPSR properly applies the "special skill" enhancement.

A two-level enhancement applies if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" U.S. SENT'G GUIDELINES MANUAL § 3B1.3. A "special skill" is "a skill not possessed by members of the general public and usually requiring substantial education, training[,] or licensing." *Id.* § 3B1.3 cmt. n.4. "Examples would include *pilots*, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* (emphasis added).

In this case, defendant's skills as a pilot are "special" within the meaning of § 3B1.1. *See United States v. Lewis*, 156 F.3d 656, 659 (6th Cir. 1998) (noting that status as a pilot is enumerated in the commentary as an example of a special skill); *United States v. Chastain*, 198 F.3d 1338, 1353 (11th Cir. 1999) (noting that the enhancement applies regardless of whether a defendant is a professional or an amateur pilot); *United States v. Mettler*, 938 F.2d 764, 767 (7th Cir. 1991) (concluding that the defendant's piloting skill is a special skill under the Guidelines).

Moreover, defendant's pilot skills extended to more than flying an aircraft, further supporting the application of the § 3B1.1 enhancement. *See United States v. Culver*, 929 F.2d 389, 393 (8th Cir. 1991) (upholding the application of the enhancement where the

45

defendant's skills as a pilot "were required to plan for fuel, devise flight paths, and to prepare the aircraft for flight after the undercover agent left"). As previously discussed, the evidence shows that defendant used his pilot skills to persuade buyers to purchase his aircraft by offering flight lessons. In doing so, defendant engaged in a scheme to defraud aircraft purchasers, supporting the application of the special skill enhancement. Accordingly, defendant's objection to the 2-level enhancement under § 3B1.3 contained in Paragraph 92 of the RPSR is **OVERRRULED**.

### F. Obstruction of Justice Enhancement

Paragraph 93 of the RPSR adds a 2-level obstruction of justice enhancement pursuant to § 3C1.1 because "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" [RPSR ¶ 93]. In support of this enhancement, Paragraphs 77 through 82 state that defendant failed to disclose certain assets or ownership interests in a financial statement provided to the government and orally withdrew his guilty plea at the forfeiture hearing on June 17, 2025, to avoid being cross-examined and disrupt the forfeiture proceedings [*Id.* ¶¶ 77–82].

Defendant objects to "any facts used or relied on in paragraphs 74 through 82" to add the obstruction of justice enhancement [Doc. 199, p. 3].[4] Defendant argues that this was bargained for in the plea agreement, the government knew these facts prior to the entry of a change of plea, and it cannot use them to alter the agreement [*Id.*]. He also submits

---

[4] Although Paragraphs 74 and 75 relate to the obstruction of justice enhancement, the offense level computation only references Paragraphs 77 through 82 as conduct supporting this enhancement [*See* RPSR ¶ 93].

that the government has not proven that he owns any assets not disclosed [*Id.*]. Additionally, defendant objects that the facts in Paragraph 93 are not part of the indictment or Count Three in which he entered a plea [*Id.* at 4]. At Phase I of the sentencing hearing, defendant argued he moved to withdraw his guilty plea in good faith after he realized that his sentencing exposure was expanded beyond the plea agreement.

The government responds that defendant's post-plea obstructive conduct, namely his attempt to avoid forfeiture and restitution and his motion to withdraw his guilty plea, warrants a 2-level enhancement [Doc. 200, p. 1]. In support, the government relies on its previously filed Notice of Objections to the PSR, in which it submits that post-plea concealment of assets and misleading the court justifies the application of the enhancement [Doc. 178, p. 6]. Further, the government argues that the obstructive conduct outlined in Paragraphs 77 through 81 of the RPSR occurred after defendant's guilty plea, demonstrating that the government did not breach the plea agreement [Doc. 200, p. 2]. At Phase I of the sentencing hearing, the government stated that defendant's jail calls contradict his argument that he was unaware of the consequences of his guilty plea.

The probation officer responds that the 2-level enhancement pursuant to § 3C1.1 is appropriate here because defendant provided false information in a financial statement by failing to disclose assets and ownership interests despite a warning that false statements violate 18 U.S.C. § 1001 [Doc. 201, p. 2]. The probation officer asserts that defendant orally moved to withdraw his guilty plea at the forfeiture hearing to end the hearing and prevent cross-examination [*Id.*]. The probation officer also notes that the enhancement

47

was not initially applied based on the plea agreement; however, it was applied in the RPSR based on defendant's post-plea conduct and the government's objection [*Id.*].

Section 3C1.1 provides for a 2-level enhancement if: "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]" U.S. SENT'G GUIDELINES MANUAL § 3C1.1. To act willfully for the purposes of § 3C1.1 means that "the defendant consciously acted with the purpose of obstructing justice." *United States v. Harris*, No. 23-6811, 2025 WL 18131, at *1 (2d Cir. Jan. 2, 2025) (internal quotation marks omitted) (quoting *United States v. Woodard*, 239 F.3d 159, 162 (2d Cir. 2001)). Moreover, § 3C1.1 applies to a wide array of conduct, including, "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding[.]" U.S. SENT'G GUIDELINES MANUAL § 3C1.1 cmt. n.4(C).

Here, the Court finds that there is sufficient evidence to conclude that defendant produced a "false, altered, or counterfeit document during an official investigation." *Id.* Specifically, defendant signed a marital settlement agreement on February 5, 2025, reporting that: (1) he had an ownership interest in Sunrise Aero, Inc., (2) his former wife was the sole owner of Sky Vault Holdings, LLC, and (3) an aircraft was sold through her company for which defendant obtained $43,900 [Doc. 163-1, pp. 29–41]. However, these assets and ownership interests were omitted from the financial statement that defendant

48

provided to the government on June 17, 2025 [Doc. 163-1, pp. 7–8, 11–25].[5] It also appears defendant did not provide several details required by the financial statement, such as account numbers and automobile numbers [*Id.* at 8, 11–25]. The contradictions between the martial settlement agreement and the financial statement make clear that defendant provided false information to the government during an official investigation, supporting the application of the obstruction of justice enhancement [*Compare id.* at 29–41 *with* Doc. 163-1, pp. 11–25].

Moreover, Agent Devane's declaration, filed in support of the government's motion to restrain defendant, notes that on June 9, 2025, defendant and his then-wife discussed aircraft "owned, controlled, or sold with knowledge of defendant" in a recorded jail call [*Id.* at 7]. During the call, defendant stated that "Pete" owed him $290,000 for selling two of his aircraft while he was incarcerated and that one of his aircraft had a pending sale [*Id.*]. Defendant concluded that Sunrise Aero owns five of his aircraft, and defendant confirmed that he would collect the money from Pete after he was released from jail [*Id.*]. Yet, defendant did not disclose the $290,000 debt or the proceeds of the purported sales as assets in his financial statement [*See id.* at 11–25]. Agent DeVane's declaration also notes conversations between defendant and his mother regarding possession and withdrawals of funds from a Chase Private Client account and the transfer of other assets among friends

---

[5] Defendant provided the financial statement to the government after the Court issued an Order directing him to do so [Doc. 159]. Therein, the Court noted that "[d]espite the government's multiple requests for this information, which defendant agreed to provide pursuant to the terms of his plea agreement, defendant has failed to comply with those requests" [*Id.* at 2].

49

and family, which Agent DeVane stated "would allow family or friends to displace or place assets in the names of nominee owners" [*Id.* at 9].

Based on this evidence, the Court finds that defendant's omissions in his financial statement impeded the government's ability to locate assets, supporting the application of the 2-level enhancement under § 3C1.1. *See United States v. Wilson*, 630 F. App'x 422, 430 (6th Cir. 2015) (upholding the application of the obstruction of justice enhancement where defendant failed to report several retirement accounts); *see also United States v. Adams*, 321 F. App'x 449, 461 (6th Cir. 2009) (upholding the application of the obstruction of justice enhancement where the defendant lied to her probation officer about her financial assets).

This conclusion is further supported by the plain language of the financial statement, signed by defendant and his counsel, which explicated stated that "any false answers can lead to the termination or nullification of any potential settlement agreement reached and/prosecution for false statements" under 18 U.S.C. § 1001, which carries a "maximum prison sentence of five (5) years and/or a fine or not more than $250,000" [Doc. 163-1, pp. 11–12]. Despite this warning, defendant provided false financial information and thereby "consciously acted with the purpose of obstructing justice," satisfying § 3C1.1. *See Harris*, 2025 WL 18131, at *2 (quoting *Woodard*, 239 F.3d at 162 (internal quotation marks omitted)).

Defendant's own statements related to the withdrawal of his plea agreement further justify the application of this enhancement. Specifically, defendant orally moved to withdraw his guilty plea at a forfeiture hearing on June 17, 2025, thereby delaying the

50

hearing [*See* Docs. 162, 174].  Thereafter, defendant filed a motion to withdraw his guilty plea, which the Court denied [Docs. 165, 174].  On June 18, 2025, during a recorded jail call with his father, defendant stated that he moved to withdraw his guilty plea "because she can't question me anymore," and "it allowed me to testify and not get cross-examined, so it kills the f[***]ing hearing on the spot" [RPSR ¶ 81].  He further stated that this "threw everybody for a f[***]ing loop" [*Id.*].  These jail calls demonstrate that defendant intended to disrupt the forfeiture proceedings and prevent his own cross-examination, thereby satisfying § 3C1.1.

Defendant's argument that the government knew the facts used to support application of the obstruction of justice enhancement prior to the entry of the change of plea is unavailing [Doc. 199, p. 3].  Defendant signed the plea agreement on October 14, 2024 [Doc. 118], and he entered his guilty plea on October 21, 2024 [Doc. 120].  The alleged obstructive conduct supporting application of the enhancement in the RPSR occurred between February 2025 and June 2025, well after defendant entered into the plea agreement [RPSR ¶¶ 77–81, 93].  Further, the initial PSR did not include an obstruction of justice enhancement [*See* Doc. 131]; however, the probation officer subsequently included it in the RPSR [RPSR ¶ 93].  Thus, there is no support for defendants' assertion that the government used these facts to alter the plea agreement, in which the parties agreed that an enhancement for obstruction of justice does not apply in this case [Doc. 118, p. 5].  Accordingly, defendant's objection to the 2-level enhancement under § 3C1.1 contained in Paragraphs 74 through 82 and 93 of the RPSR is **OVERRRULED**.

## G.  Acceptance of Responsibility Adjustment

Paragraphs 83 through 85 of the RPSR conclude that a 2-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) does not apply in this case based on defendant's attempt to withdraw his guilty plea, his statement regarding maintaining his innocence, his efforts to conceal and dissipate assets, and his attempts to frustrate forfeiture [RPSR ¶¶ 83–85].  In support, the RPSR cites defendant's motion to withdraw his guilty plea, which states that defendant "has continuously asserted his innocence" and "affirmatively denied criminal intent and wrongdoing in this matter" [*Id.*; Doc. 165, p. 3].

Defendant objects that he bargained for an acceptance of responsibility reduction because the government had an opportunity to withhold its objection to defendant's guilty plea and refused to do so [Doc. 199, p. 3].  He argues that the government now takes "the position that [it] wants the guilty plea and want[s] to take back what was given" [*Id.*].  He alleges that the government withheld evidence and negated his constitutional rights [*Id.*].

The government responds that there is sufficient information about defendant's post-plea conduct for the Court to determine if an acceptance of responsibility reduction is warranted [Doc. 200, p. 2].  It does not oppose a two-level reduction for acceptance of responsibility, and it notes that the Court could reasonably find that this reduction is not warranted based on defendant's post-plea obstruction of justice [*Id.* at 3].  At Phase I of the sentencing hearing, the government clarified that it does not move for the third level for acceptance of responsibility under § 3E1.1(b).

Section 3E1.1(a) provides a 2-level reduction in offense level if "the defendant clearly demonstrates acceptance of responsibility for his offense[.]"  U.S. SENT'G

GUIDELINES MANUAL § 3E1.1(a).  The commentary explains that "[c]onduct resulting in an [obstruction of justice] enhancement . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."  *Id.* § 3E1.1 cmt. n.4; *see also United States v. Vargas-Gutierrez*, 464 F. App'x 492, 498 (6th Cir. 2012).  However, adjustments under both §§ 3C1.1 and 3E1.1(a) may apply in "extraordinary cases."  *United States v. Paull*, 551 F.3d 516, 528 (6th Cir. 2009) (quoting U.S. SENT'G GUIDELINES MANUAL § 3E1.1, cmt. n.4); *United States v. Schwartz*, 408 F. App'x 868, 873 (6th Cir. 2010) (quoting *United States v. Roche*, 321 F.3d 607, 609–10 (6th Cir. 2003)) ("[O]nly in the 'extraordinary' case does the defendant's obstructive conduct not outweigh the defendant's acceptance of responsibility.").  In determining whether to apply the "extraordinary case" exception, district courts are given "great leeway."  *Paull*, 551 F.3d at 528 (quoting *United States v. Roberts*, 243 F.3d 235, 241 (6th Cir. 2001)).

Here, the Court finds that a two-level reduction of the offense level is appropriate based on defendant's "acceptance of responsibility for his offense[.]"  U.S. SENT'G GUIDELINES MANUAL § 3E1.1(a).  The record shows that defendant accepted responsibility for his conduct when he pled guilty to Count Three of the indictment, that is, wire fraud, in violation of 18 U.S.C. § 1343 [Doc. 120].  Defendant subsequently moved to withdraw his plea after he realized that his sentencing exposure would be based on relevant conduct extending beyond Count Three [Docs. 165].

Under these circumstances, defendant's attempt to withdraw his guilty plea does not undermine his otherwise clear acceptance of responsibility for his offense.  Moreover, the plea agreement in this case provides that, "[g]iven the defendant's agreement to plead

guilty, the government will not oppose a 2-level reduction for acceptance of responsibility" under § 3E1.1(a) [Doc. 118, p. 5].  Given that the government does not oppose a 2-level reduction for acceptance of responsibility under § 3E1.1(a), which was bargained for in the plea agreement, defendant's objection in this regard is **SUSTAINED.**

## IV. Conclusion

For all the reasons set forth above, defendant's objection to the acceptance of responsibility reduction under § 3E1.1(a) is **SUSTAINED**, and his remaining objections to the RPSR [Doc. 199] are **OVERRULED**.  Defendant's guideline range will be calculated based on a total offense level of 23, criminal history category I, resulting in a guideline range of 46 to 57 months' imprisonment.[6]  The courtroom deputy will contact the parties to schedule Phase II of the sentencing hearing.  The Court will take up all other sentencing arguments and impose a sentence at that time.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[6]  The Court notes that the government also moves for an upward departure under the former U.S.S.G. § 4A1.3, as well as an upward variance pursuant to 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0 [Doc. 188, pp. 19, 22].  The Court will address the government's motions at Phase II of the sentencing hearing.

54